The defendant pleaded not guilty, under the common rule.
He held under a title derived from the State, by a deed from a Superintendent Commissioner of confiscated estates.
At May Term, 1786, Nash for the defendant, moved that the suit be dismissed, according to an act of the last session, entitled an act to secure and quiet in their possession all such persons, their heirs and assigns, who have purchased or may hereafter purchase lands and tenements, goods and chattels, which have been sold or may hereafter be sold by commissioners of forfeited estates, legally appointed for that purpose, 1785, 7, 553.
The act requires the Courts, in all cases where the defendant makes affidavit that he holds the disputed property under a sale from a commissioner of forfeited estates, to dismiss the suit on motion.
The defendant had filed an affidavit, setting forth that the property in dispute had been confiscated and sold by the Commissioner of the district.
This brought on long arguments from the counsel on each side, on constitutional points.
 The Court made a few observations on our Constitution and system of government.
observed that at the time of our separation from Great Britain, we were thrown into a similar situation with a set of people shipwrecked and cast on a marooned island — without laws, without magistrates, without government, or any legal authority — that being thus circumstanced, the people of this country, with a general union of sentiment, by their delegates, met in Congress, and formed that system of those fundamental principles comprised in the Constitution, dividing the powers of government into separate and distinct branches, to wit: The legislative, the judicial, and executive, and assigning to each several and distinct powers, and prescribing their several limits and boundaries; this he said without disclosing a single sentiment upon the cause of the proceeding, or the law introduced in support of it.
Curia advisare vult.
At May Term, 1787, Nash's motion was resumed, and produced a very lengthy debate from the bar. *Page 17 
Whereupon the Court recommended to the parties to consent to a fair decision of the property in question, by a jury according to the common law of the land, and pointed out to the defendant the uncertainty that would always attend his title if this cause should be dismissed without a trial; as upon a repeal of the present act (which would probably happen sooner or later), suit might be again commenced against him for the same property, at the time when evidences, which at present were easy to be had, might be wanting. But this recommendation was without effect.
Another mode was proposed for putting the matter in controversy on a more constitutional footing for a decision than that of the motion under the aforesaid act. The Court then, after every reasonable endeavor had been used in vain for avoiding a disagreeable difference between the Legislature and the Judicial powers of the State, at length, with much apparent reluctance but with great deliberation and firmness, gave their opinion separately but unanimously for overruling the aforementioned motion for the dismission of the said suits.
In the course of which the Judges observed that the obligation of their oaths and the duty of their office required them, in that situation, to give their opinion on that important and momentous subject; and that notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the State, yet (7) no object of concern or respect could come in competition or authorize them to dispense with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths.
That they therefore were bound to declare that they considered that whatever disabilities the persons under whom the plaintiffs were said to derive their titles might justly have incurred against their maintaining or prosecuting any suits in the Courts of this State; yet that such disabilities, in their nature, were merely personal, and not by any means capable of being transferred to the present plaintiffs, either by descent or purchase; and that these plaintiffs being citizens of one of the United States, or citizens of this State, by the confederation of all the States; which is to be taken as a part of the law of the land, unrepealable by any act of the General Assembly.
That by the Constitution every citizen had undoubtedly a right to a decision of his property by a trial by jury. For that if the Legislature could take away this right, and require him to stand condemned in his property without a trial, it might with as much authority require his life to be taken away without a trial by jury, and that he should stand condemned to die, without the formality of any trial at all: that if the *Page 18 
members of the General Assembly could do this, they might with equal authority, not only render themselves the Legislators of the State for life, without any further election of the people, from thence transmit the dignity and authority of legislation down to their heirs male forever.
But that it was clear that no act they could pass could by any means repeal or alter the Constitution, because if they could do this, they would at the same instant of time destroy their own existence as a Legislature, and dissolve the government thereby established. Consequently, the Constitution (which the judicial power was bound to take notice of as much as of any other law whatever), standing in full force as the fundamental law of the land, notwithstanding the act on which the present motion was grounded, the same act must of course, in that instance, stand as abrogated and without any effect.
Nash's motion was overruled.
And at this term the cause was tried.
(8) Both the plaintiffs and the defendant admitted the title of the premises to have been in Samuel Cornell, Esq., at and before the time when the independence of this State commenced.
The case appeared to be this: Mr. Cornell, once an inhabitant of New Bern, leaving his family, together with the premises in question, and a variety of property in this town, took shipping on the 19th of August, 1775, and went to Great Britain, where he continued till some time in the latter part of the year 1777, when he came to New York, then occupied by a British garrison; and as a British subject came from thence and arrived in New Bern on the 11th of December, 1777, and under the protection of a British flag.
His principal design, in coming to this State at that time, was to take his wife and family with him, to reside under the British Government, if he did not find our new government agreeable to his wishes. Not being pleased with the appearance of things here, and thereupon preparing to leave the State, and to carry with him his wife and family, he executed, on board the vessel he came in, a deed to his daughter, one of the plaintiffs (under which they claim), for the premises in question, on the 19th of December, 1777.
This deed for the purpose of execution had been handed to him without a date, and being asked what date he chose it should bear, he hesitated and said he would look at the copy of a bill which was then in his possession, which bill he understood to be on its passage in the Legislature, for confiscating the property of all persons of his description, who should not within a limited time come into this State, and be made citizens thereof, which bill afterwards in the same session passed into a law. After looking at the aforesaid copy of that bill, he chose that the *Page 19 
deed should bear date on the 11th of the same month, being the day he arrived in the harbor of New Bern; which deed was accordingly dated that day. After which Mr. Cornell returned with his family from this State, and from thenceforth lived and died a British subject, under the British Government.