KATHLEEN M. LEANDRO, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ROBERT A. LEANDRO; STEVEN R. SUNKEL, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* FOR ANDREW J. SUNKEL; CLARENCE L. PENDER, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF SCHNIKA N. PENDER; TYRONE T. WILLIAMS, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF TREVELYN L. WILLIAMS; D.E. LOCKLEAR, JR., INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JASON E. LOCKLEAR; ANGUS B. THOMPSON, II, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF VANDALIAH J. THOMPSON; JENNIE G. PEARSON, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF SHARESE D. PEARSON; WAYNE TEW, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF NATOSHA L. TEW; DANA HOLTON JENKINS, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF RACHEL M. JENKINS; FLOYD VICK, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ERVIN D. VICK; HOKE COUNTY BOARD OF EDUCATION; HALIFAX COUNTY BOARD OF EDUCATION; ROBESON COUNTY BOARD OF EDUCATION; CUMBERLAND COUNTY BOARD OF EDUCATION; VANCE COUNTY BOARD OF EDUCATION, PLAINTIFFS,

AND

CASSANDRA INGRAM, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF DARRIS INGRAM; CAROL PENLAND, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JEREMY PENLAND; DARLENE HARRIS, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF SHAMEK HARRIS; NETTIE THOMPSON, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ANNETTE RENEE THOMPSON; DAVID MARTINEZ, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF DANIELA MARTINEZ; OPHELIA AIKEN, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF BRANDON BELL; ASHEVILLE CITY BOARD OF EDUCATION; BUNCOMBE COUNTY BOARD OF EDUCATION; CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; DURHAM PUBLIC SCHOOLS BOARD OF EDUCATION; WAKE COUNTY BOARD OF EDUCATION; WINSTON SALEM/FORSYTH COUNTY BOARD OF EDUCA-TION, PLAINTIFF-INTERVENORS v. STATE OF NORTH CAROLINA; STATE BOARD OF EDUCATION, DEFENDANTS

No. 179PA96

(Filed 24 July 1997)

**1. Constitutional Law § 94 (NCI4th)— public education sys-tem—constitutional challenge—justiciable issue**

A constitutional challenge to the state's public education sys-tem is not a nonjusticiable political question but is an issue which the courts have a duty to address.

**Am Jur 2d, Constitutional Law §§ 169, 312; Federal Courts § 685.**

**2. Constitutional Law § 94 (NCI4th)— public schools—child's right to sound basic education**

Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools. A "sound basic education" is one that will provide

the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

**Am Jur 2d, Municipal, County, School, and State Tort Liability § 624; Schools § 216.**

**Tort liability of public schools and institutions of higher learning for educational malpractice. 1 ALR4th 1139.**

**3. Constitutional Law § 94 (NCI4th); Schools § 47 (NCI4th)— funding of public schools—no violation of "equal opportunities" clause**

The "equal opportunities" clause of Article IX, Section 2(1) of the North Carolina Constitution does not require substantially equal funding or educational advantages in all school districts. Consequently, the provisions of the current state system for funding schools which require or allow counties to help finance their school systems and result in unequal funding among the school districts of the state do not violate constitutional principles.

**Am Jur 2d, Constitutional Law § 764; Schools §§ 9, 92, 93.**

**Validity of basing public school financing system on local property taxes. 41 ALR3d 1220.**

**4. Constitutional Law § 94 (NCI4th); Schools § 47 (NCI4th)— state funding of public schools—additional funding by local governments—constitutionality**

Because Article IX, Section 2(2) of the North Carolina Constitution expressly states that units of local governments

with responsibility for public education may provide additional funding to supplement the educational programs provided by the state, there can be nothing unconstitutional about their doing so or in any inequality of opportunity occurring as a result.

**Am Jur 2d, Constitutional Law § 764; Schools §§ 9, 92, 93.**

**Validity of basing public school financing system on local property taxes. 41 ALR3d 1220.**

5. **Constitutional Law § 94 (NCI4th); Schools § 47 (NCI4th)— disparities in school funding—local supplements— constitutionality**

Disparities in school funding resulting from local supplements in the wealthier school districts do not deprive those in the poorer school districts of equal protection of the laws in violation of Article I, Section 19 of the North Carolina Constitution because such disparities are expressly authorized by Article IX, Section 2(2), and terms or requirements of a constitution cannot be in violation of the same constitution.

**Am Jur 2d, Constitutional Law § 764; Schools §§ 9, 92, 93.**

**Validity of basing public school financing system on local property taxes. 41 ALR3d 1220.**

6. **Constitutional Law § 94 (NCI4th)— sound basic education—supplemental state funding—power of legislature**

The General Assembly has the inherent power to do those things reasonably related to meeting its constitutionally prescribed duty of providing the children of every school district with access to a sound basic education, including the power to create a supplemental state funding program which has as its purpose the provision of additional state funds to poor districts so that they can provide their students access to a sound basic education. However, a funding system that distributes state funds to the districts in an arbitrary and capricious manner unrelated to such educational objectives would not be a valid exercise of that constitutional authority and could result in a denial of equal protection or due process.

**Am Jur 2d, Constitutional Law § 764; Schools §§ 9, 92, 93.**

**7. Constitutional Law § 94 (NCI4th)— public schools—supplemental state funding—arbitrariness and capriciousness—sufficient allegations by wealthy counties**

Plaintiff-intervenors have made sufficient allegations in their complaint to entitle them to proceed to attempt to prove that the state supplemental funding system is unrelated to legitimate educational objectives and, therefore, is arbitrary and capricious where they alleged that their relatively wealthy urban districts have been denied equal protection of the laws because they have greater numbers of students requiring special education programs than other districts, and the current funding system does not take into consideration the amount of money required to educate particular students with special needs.

**Am Jur 2d, Schools §§ 9, 92, 93.**

**8. Schools § 2 (NCI4th)— school funding system—violations of chapter 115C—depriving children of sound basic education—sufficient allegations**

Plaintiff-parties' allegations that the current school funding system violates portions of N.C.G.S. §§ 115C-1, 115C-81(a1), 115C-122(3), and 115C-408(b) state a claim upon which relief may be granted if they are supported by substantial evidence that the alleged violations of chapter 115C have occurred and that those violations have deprived children of some school districts of the opportunity to receive a sound basic education.

**Am Jur 2d, Schools §§ 8, 9.**

**9. Constitutional Law § 94 (NCI4th)— public school funding—denial of sound basic education—factors considered**

Factors which may be considered by the trial court in its determination as to whether any of the state's children are being denied their right to a sound basic education by the current school funding system include the goals and standards adopted by the legislature; the level of performance of the children of the state and its various districts on standard achievement tests; and the level of the state's general educational expenditures and per-pupil expenditures. However, no single factor will be determinative of this issue, and other factors may be relevant for consideration in appropriate circumstances when determining this issue.

**Am Jur 2d, Municipal, County, School, and State Tort Liability § 624.**

Tort liability of public schools and institutions of higher learning for educational malpractice. 1 ALR4th 1139.

10. **Constitutional Law § 94 (NCI4th)— sound basic education—deference to legislative and executive branches**

The courts of the state must grant every reasonable deference to the legislative and executive branches of government when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education, and a clear showing to the contrary must be made before the courts may conclude that they have not.

**Am Jur 2d, Municipal, County, School, and State Tort Liability § 624.**

**Tort liability of public schools and institutions of higher learning for educational malpractice. 1 ALR4th 1139.**

11. **Constitutional Law § 94 (NCI4th)— denial of sound basic education—fundamental right—burden on defendants— duty of court**

If the trial court makes findings and conclusions from competent evidence that defendants, the State and the State Board of Education, are denying children of the state a sound basic education, a denial of a fundamental right will have been established, and it will then become incumbent upon defendants to establish that their actions denying this fundamental right are necessary to promote a compelling governmental interest. If defendants are unable to do so, it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government.

**Am Jur 2d, Constitutional Law § 750.**

Justice Orr dissenting in part and concurring in part.

On discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal of right of a constitutional question pursuant to N.C.G.S. § 7A-30(1) to review a unanimous decision of the Court of Appeals, 122 N.C. App. 1, 468 S.E.2d 543 (1996), reversing an order entered by Braswell, J., on 1 February 1995 in the Superior Court, Halifax

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

County, denying defendants' motion to dismiss. Heard in the Supreme Court 17 October 1996.

*Parker, Poe, Adams & Bernstein L.L.P., by Robert W. Spearman and Robert H. Tiller; and Hux, Livermon & Armstrong, by H. Lawrence Armstrong, Jr., for plaintiff-appellants and -appellees.*

*Smith Helms Mulliss & Moore, L.L.P., by Richard W. Ellis, for plaintiff-intervenor-appellants and -appellees.*

*Michael F. Easley, Attorney General, by Edwin M. Speas, Jr., Senior Deputy Attorney General, and Ronald M. Marquette and Tiare B. Smiley, Special Deputy Attorneys General, for defendant-appellants -appellees.*

*North Carolina School Boards Association, by Ann W. McColl, amicus curiae.*

*Petree Stockton, L.L.P., by M. Gray Styers, Jr., on behalf of Eastern North Carolina Chamber of Commerce, amicus curiae.*

*North Carolina Education and Law Project, by Gregory C. Malhoit, Carlene McNulty, and Stephon J. Bowens; and Legal Services of North Carolina, by Deborah M. Weissman and John Vail, amici curiae.*

*Everett, Gaskins, Hancock & Stevens, by William G. Hancock, Hugh Stevens, and Jeffrey B. Parsons, on behalf of the North Carolina Low Wealth Schools Funding and Equalization Consortium and Education: Everybody's Business Coalition, amicus curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Michael Weddington, B. Davis Horne, Jr., and Robert J. Morris, on behalf of the Small Rural School Consortium, amicus curiae.*

*John Charles Boger; Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., by Ann Hubbard; and Debra K. Ross, Legal Director, on behalf of the American Civil Liberties Union of North Carolina, amicus curiae.*

MITCHELL, Chief Justice.

Plaintiffs originally brought this action in Halifax County. Defendants moved for a transfer of venue to Wake County contend-

ing that under N.C.G.S. § 1-77(2), Wake County was the only proper venue for this action against public officers. Judge E. Maurice Braswell entered an order on 19 January 1995 transferring venue to Wake County and directing that all papers relating to this suit be forwarded to the Clerk of Superior Court for Wake County.

Plaintiffs in this action for declaratory and injunctive relief are students and their parents or guardians from the relatively poor school systems in Cumberland, Halifax, Hoke, Robeson, and Vance Counties and the boards of education for those counties. Plaintiff-intervenors are students and their parents or guardians from the relatively large and wealthy school systems of the City of Asheville and of Buncombe, Wake, Forsyth, Mecklenburg, and Durham Counties and the boards of education for those systems. Both plaintiffs and plaintiff-intervenors (hereinafter "plaintiff-parties" when referred to collectively) allege in their complaints in the case resulting in this appeal that they have a right to adequate educational opportunities which is being denied them by defendants under the current school funding system. Plaintiff-parties also allege that the North Carolina Constitution not only creates a fundamental right to an education, but it also guarantees that every child, no matter where he or she resides, is entitled to equal educational opportunities. Plaintiff-parties allege that defendants have denied them this right.

Plaintiffs allege that children in their poor school districts are not receiving a sufficient education to meet the minimal standard for a constitutionally adequate education. Plaintiffs further allege that children in their districts are denied an equal education because there is a great disparity between the educational opportunities available to children in their districts and those offered in more wealthy districts of our state. Plaintiffs allege that their districts lack the necessary resources to provide fundamental educational opportunities for their children due to the nature of the state's system of financing education and the burden it places on local governments. They allege that the state leaves the funding of capital expenses, as well as twenty-five percent of current school expenses, to local governments. They further allege that although their poor districts are the beneficiaries of higher local tax rates than many wealthy school districts, those higher rates cannot make up for their lack of resources or for the disparities between systems. Plaintiffs also allege that students in their poor school districts are not receiving the education called for by the Basic Education Program, part of the statutory framework for providing education to the children of this state.

## LEANDRO v. STATE OF NORTH CAROLINA

[346 N.C. 336 (1997)]

Plaintiffs complain of inadequate school facilities with insufficient space, poor lighting, leaking roofs, erratic heating and air conditioning, peeling paint, cracked plaster, and rusting exposed pipes. They allege that their poor districts' media centers have sparse and outdated book collections and lack the technology present in the wealthier school districts. They complain that they are unable to compete for high quality teachers because local salary supplements in their poor districts are well below those provided in wealthy districts. Plaintiffs allege that this relative inability to hire teachers causes the number of students per teacher to be higher in their poor districts than in wealthy districts.

Plaintiffs allege that college admission test scores and yearly aptitude test scores reflect both the inadequacy and the disparity in education received by children in their poor districts. Plaintiffs allege that end-of-grade tests show that the great majority of students in plaintiffs' districts are failing in basic subjects.

Plaintiff-intervenors allege that the current state educational funding system does not sufficiently take into consideration the burdens faced by their urban school districts, which must educate a large number of students with extraordinary educational needs. In particular, plaintiff-intervenors claim that their school districts have a large number of students who require special education services, special English instruction, and academically gifted programs. They allege that providing these services requires plaintiff-intervenor school boards to divert substantial resources from their regular education programs.

Plaintiff-intervenors contend that defendants, the State of North Carolina and the State Board of Education, have violated the North Carolina Constitution and chapter 115C of the North Carolina General Statutes by failing to ensure that their relatively wealthy school districts have sufficient resources to provide all of their students with adequate and equal educational opportunities. In addition, plaintiff-intervenors claim that the state's singling out of certain poor rural districts to receive supplemental state funds, while failing to recognize comparable if not greater needs in the urban school districts, is arbitrary and capricious in violation of the North Carolina Constitution and state law. Plaintiff-intervenors allege that deficiencies in physical facilities and educational materials are particularly significant in their systems because most of the growth in North Carolina's student population is taking place in urban areas such as those served by plaintiff-intervenor school boards. They claim that

their urban districts must serve a disproportionate number of children who due to poverty, language barriers, or other handicaps, require special resources. They allege that because urban counties have high levels of poverty, homelessness, crime, unmet health care needs, and unemployment which drain their fiscal resources, they cannot allocate as large a portion of their local tax revenues to public education as can the more rural poor districts.

In response to plaintiffs' and plaintiff-intervenors' complaints seeking declaratory and other relief, defendants filed a motion to dismiss under N.C.G.S. § 1A-1, Rule 12(b)(1), (2), and (6), asserting that the trial court lacked subject matter and personal jurisdiction and that plaintiff-parties had failed to state any claim upon which relief could be granted. After a hearing, Judge Braswell denied defendants' motion to dismiss. Defendants filed a timely notice of appeal to the Court of Appeals from the order denying their motion to dismiss. Following denial of a joint petition of the parties for discretionary review by this Court prior to determination by the Court of Appeals, defendants filed an alternative petition for writ of certiorari with the Court of Appeals. The petition was allowed, and the matter was heard 24 January 1996 in the Court of Appeals.

The Court of Appeals reversed the trial court's order denying defendants' motion to dismiss. In its opinion, the Court of Appeals concluded that the right to education guaranteed by the North Carolina Constitution is limited to one of equal access to the existing system of education and does not embrace a qualitative standard. *Leandro v. North Carolina*, 122 N.C. App. 1, 11, 468 S.E.2d 543, 550 (1996). The Court of Appeals found plaintiff-parties' claims to be indistinguishable from the plaintiffs' claims in *Britt v. N.C. State Bd. of Educ.*, 86 N.C. App. 282, 357 S.E.2d 432, *disc. rev. denied and appeal dismissed*, 320 N.C. 790, 361 S.E.2d 71 (1987), which the Court of Appeals had found without merit. Therefore, the Court of Appeals concluded that plaintiff-parties' claims were foreclosed.

Plaintiff-parties petitioned this Court for discretionary review pursuant to N.C.G.S. § 7A-31. We allowed those petitions. Plaintiffs also gave notice of appeal as a matter of right on the basis that their claims presented substantial constitutional questions.

[1] Defendants argued in the Court of Appeals that the trial court had erred by denying their motion to dismiss plaintiff-parties' educational adequacy claims as being "nonjusticiable political questions." Defendants did not raise this defense as to plaintiff-parties' other

claims. The Court of Appeals based its decision on other grounds and did not reach the "political question" issue, but defendants maintain that the "political question" issue is a threshold question that must be addressed. We address it now.

It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution. *See, e.g., Mitchell v. N.C. Indus. Dev. Fin. Auth.*, 273 N.C. 137, 144, 159 S.E.2d 745, 750 (1968); *Ex parte Schenck*, 65 N.C. 353, 367 (1871); *Bayard v. Singleton*, 1 N.C. 5, 6-7 (1787). When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits. *See Maready v. City of Winston-Salem*, 342 N.C. 708, 716, 467 S.E.2d 615, 620 (1996) ("It is the duty of this Court to ascertain and declare the intent of the framers of the Constitution and to reject any act in conflict therewith."). Therefore, it is the duty of this Court to address plaintiff-parties' constitutional challenge to the state's public education system. Defendants' argument is without merit.

Plaintiff-parties first argue that the Court of Appeals erred in holding that no right to a qualitatively adequate education arises under the North Carolina Constitution. We agree.

The right to a free public education is explicitly guaranteed by the North Carolina Constitution: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. The Constitution also provides:

> The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.

*Id.* art. IX, § 2(1). The principal question presented by this argument is whether the people's constitutional right to education has any qualitative content, that is, whether the state is required to provide children with an education that meets some minimum standard of quality. We answer that question in the affirmative and conclude that the right to education provided in the state constitution is a right to a sound basic education. An education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate.

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

The Court of Appeals concluded that the right to education guaranteed by the state constitution "is limited to one of equal access to education, and it does not embrace a qualitative standard." *Leandro*, 122 N.C. App. at 11, 468 S.E.2d at 550. It based its holding on a single sentence from this Court's opinion in *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 264 S.E.2d 106 (1980): " 'It is clear, then, that equal access to participation in our public school system is a fundamental right, guaranteed by our state constitution and protected by considerations of procedural due process.' " *Leandro*, 122 N.C. App. at 11, 468 S.E.2d at 550 (quoting *Sneed*, 299 N.C. at 618, 264 S.E.2d at 113).

*Sneed* involved a challenge to the Greensboro City Board of Education's practice of charging public school students with incidental course and instructional fees and of denying enrollment to those who did not pay the fees and failed to get a waiver. This Court concluded that imposing such fees on students and parents who were financially able to pay did not offend the North Carolina Constitution's requirement of a general and uniform system of free public schools. *Sneed*, 299 N.C. at 617, 264 S.E.2d at 113. We further concluded, however, that the school system's failure to provide poor students and their parents with adequate notice of provisions for waiver of the fees was unconstitutional. *Id.* at 618-19, 264 S.E.2d at 113-14. It was in the context of this holding protecting the right of poor students to equal access to existing public education opportunities that this Court made the statement relied upon by the Court of Appeals. The present case does not involve issues of equal access to available educational opportunities, and the Court of Appeals' reliance upon *Sneed* was misplaced.

This Court has long recognized that there is a qualitative standard inherent in the right to education guaranteed by this state's constitution. In *Board of Educ. v. Board of Comm'rs of Granville County*, 174 N.C. 469, 93 S.E. 1001 (1917), for example, we stated:

[I]t is manifest that these constitutional provisions were intended to establish a system of public education *adequate to the needs of a great and progressive people*, affording school facilities of recognized and ever-increasing merit to all the children of the State, and to the full extent that our means could afford and intelligent direction accomplish.

*Id.* at 472, 93 S.E. at 1002 (emphasis added).

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

The General Assembly also seems to have recognized the constitutional right to a sound basic education and to have embraced that right in chapter 115C of the General Statutes. For example, in a statute governing the use of funds under the control of the State Board of Education, the General Assembly has stated:

> (a) It is the policy of the State of North Carolina to create a public school system that graduates good citizens with the skills demanded in the marketplace, and the skills necessary to cope with contemporary society, using State, local and other funds in the most cost-effective manner. . . .

> (b) To insure a *quality* education for every child in North Carolina, and to assure that the necessary resources are provided, it is the policy of the State of North Carolina to provide from State revenue sources the instructional expenses for current operations of the public school system as defined in the standard course of study.

N.C.G.S. § 115C-408 (1994) (emphasis added). In addition, the legislature has required local boards of education "to provide *adequate* school systems within their respective local school administrative units, as directed by law." N.C.G.S. § 115C-47(1) (Supp. 1996) (emphasis added).

[2] We conclude that Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools. For purposes of our Constitution, a "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society. *See generally Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989); *Pauley v. Kelly*, 162 W. Va. 672, 705-06, 255 S.E.2d 859, 877 (1979).

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

The trial court properly denied defendants' motion to dismiss this claim for relief. The Court of Appeals erred in concluding otherwise.

By other arguments, plaintiff-parties contend that the Court of Appeals erred in holding that the alleged disparity in the educational opportunities offered by the different school districts in the state does not violate their right to equal opportunities for education. They contend that Article IX, Section 2(1), requiring a "general and uniform system" in which "equal opportunities shall be provided for all students," mandates equality in the educational programs and resources offered the children in all school districts in North Carolina.

Plaintiffs and plaintiff-intervenors make somewhat different arguments in support of their purported rights to equal educational opportunities. Specifically, plaintiffs contend that inequalities in the facilities, equipment, student-teacher ratios, and test results between their poor districts and the wealthy districts compel the conclusion that students in their poor districts are denied equal opportunities for education. Plaintiffs contend that such inequalities arise from great variations in per-pupil expenditures from district to district.

We first look to the North Carolina Constitution itself to determine whether it provides a basis for relief. It places upon the General Assembly the duty of providing for "a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2(1). We conclude that at the time this provision was originally written in 1868 providing for a "general and uniform" system but without the equal opportunities clause, the intent of the framers was that every child have a fundamental right to a sound basic education which would prepare the child to participate fully in society as it existed in his or her lifetime. *See, e.g., City of Greensboro v. Hodgin,* 106 N.C. 182, 190, 11 S.E. 586, 589 (1890); *Lane v. Stanly,* 65 N.C. 153, 158 (1871). The 1970 amendment adding the equal opportunities clause ensured that all the children of this state would enjoy this right.

[3] The issue here, however, is plaintiffs' contention that North Carolina's system of school funding, based in part on funding by the county in which the district is located, necessarily denies the students in plaintiffs' relatively poor school districts educational opportunities equal to those available in relatively wealthy districts and thereby violates the equal opportunities clause of Article IX, Section

LEANDRO v. STATE OF NORTH CAROLINA

[346 N.C. 336 (1997)]

2(1). Although we have concluded that the North Carolina Constitution requires that access to a sound basic education be provided equally in every school district, we are convinced that the equal opportunities clause of Article IX, Section 2(1) does not require substantially equal funding or educational advantages in all school districts. We have considered the language and history underlying this and other constitutional provisions concerned with education as well as former opinions by this Court. As a result, we conclude that provisions of the current state system for funding schools which require or allow counties to help finance their school systems and result in unequal funding among the school districts of the state do not violate constitutional principles.

Article IX, Section 2(2) of the North Carolina Constitution expressly authorizes the General Assembly to require that local governments bear part of the costs of their local public schools. Further, it expressly provides that local governments may add to or supplement their school programs as much as they wish.

> The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.

N.C. Const. art. IX, § 2(2).

The idea that counties are to participate in funding their local school districts has a long history. In 1890, for example, Chief Justice Merriman wrote for this Court that

> the funds necessary for the support of public schools—the public school system—are not derived exclusively from the State. The Constitution plainly contemplates and intends that the several counties, as such, shall bear a material part of the burden of supplying such funds.

*Hodgin*, 106 N.C. at 187-88, 11 S.E. at 588.

[4] Because the North Carolina Constitution expressly states that units of local governments with financial responsibility for public education may provide additional funding to supplement the educational programs provided by the state, there can be nothing unconstitutional about their doing so or in any inequality of opportunity

occurring as a result. We agree with the reasoning of the Court of Appeals in *Britt* that

> the Constitution itself contains provisions that contradict plaintiffs' arguments. The governing boards of units of local government having financial responsibility for public education are expressly authorized to "use local revenues to add to or supplement any public school or post-secondary school program." N.C. Const., Article IX, § 2(2). Clearly then, a county with greater financial resources will be able to supplement its programs to a greater degree than less wealthy counties, resulting in enhanced educational opportunity for its students. . . . [This] provision[] obviously preclude[s] the possibility that exactly equal educational opportunities can be offered throughout the State.

*Britt*, 86 N.C. App. at 288, 357 S.E.2d at 435-36.

Further, as the North Carolina Constitution so clearly creates the likelihood of unequal funding among the districts as a result of local supplements, we see no reason to suspect that the framers intended that substantially equal educational opportunities beyond the sound basic education mandated by the Constitution must be available in all districts. A constitutional requirement to provide substantial equality of educational opportunities in every one of the various school districts of the state would almost certainly ensure that no matter how much money was spent on the schools of the state, at any given time some of those districts would be out of compliance. If strong local public support in a given district improved the educational opportunities of that district to the point that they were substantially better than those of any other district, the children of all the other school districts by definition would be denied substantially equal educational opportunities. The result would be a steady stream of litigation which would constantly interfere with the running of the schools of the state and unnecessarily deplete their human and fiscal resources as well as the resources of the courts.

Substantial problems have been experienced in those states in which the courts have held that the state constitution guaranteed the right to a sound basic education. *See generally Horton v. Meskill*, 195 Conn. 24, 486 A.2d 1099 (1985) (describing changes in the Connecticut public schools since the Connecticut Supreme Court had struck down an earlier financing system); *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717 (Tex. 1995) (a 5-4 decision upholding the state's school financing plan after the Texas Supreme Court had

struck down three state plans for funding public education in Texas); *State ex rel. Bds. of Educ. v. Chafin*, 180 W. Va. 219, 376 S.E.2d 113 (1988) (describing changes in the public schools since the Supreme Court of West Virginia had struck down the school financing system); William E. Thro, *The Third Wave: The Impact of the Montana, Kentucky, and Texas Decisions on the Future of Public School Finance Reform Litigation*, 19 J.L. & Legal Educ. 219 (1990) (describing the difficulty in understanding and implementing the mandates of the courts); James S. Liebman, *Implementing* Brown *in the Nineties: Political Reconstruction, Liberal Recollection, and Litigatively Enforced Legislative Reform*, 76 Va. L. Rev. 349, 392-93 (1990) (arguing that changes in Connecticut schools after successful litigation had failed to improve student performance); Note, *Unfulfilled Promises: School Finance Remedies and State Courts*, 104 Harv. L. Rev. 1072, 1075-78 (1991) (describing the lack of an adequate remedy in New Jersey). We believe that even greater problems of protracted litigation resulting in unworkable remedies would occur if we were to recognize the purported right to equal educational opportunities in every one of the state's districts. *See generally Abbott v. Burke*, 693 A.2d 417 (N.J. 1997) (decision of a divided Court striking down the most recent efforts of the New Jersey legislature and for the third time declaring the funding system for the schools of that state to be in violation of the state constitution). We conclude that the framers of our Constitution did not intend to set such an impractical or unattainable goal. Instead, their focus was upon ensuring that the children of the state have the opportunity to receive a sound basic education.

For the foregoing reasons, we conclude that Article IX, Section 2(1) of the North Carolina Constitution requires that all children have the opportunity for a sound basic education, but it does not require that equal educational opportunities be afforded students in all of the school districts of the state. The Court of Appeals did not err in reversing the order of the trial court to the extent that order denied defendants' motion to dismiss this claim for relief.

Plaintiff-intervenors make a different argument. They neither allege in their complaint nor argue before this Court that constitutionally mandated educational opportunities require equal funding. Instead, they allege and contend that due to the particular demographics of their urban districts, which include many disadvantaged children, the current state system leaves them unable to provide all of their students a "minimally adequate" basic education. Ironically, if

plaintiff-intervenors' argument should prevail, they would be entitled to an unequally large per-pupil allocation of state school funds for their relatively wealthy urban districts. When reduced to its essence, however, this argument by plaintiff-intervenors is merely repetitious of their previous argument that the state must provide all of its children with the opportunity to receive a sound basic education. As we have already concluded that the children of the state enjoy that right and that plaintiff-intervenors may proceed on that claim, we need not and do not address this argument by plaintiff-intervenors.

[5] In another argument, plaintiffs contend that the disparities in the funding provided their poor school districts as compared to the wealthier districts deprive them of equal protection of the laws in violation of Article I, Section 19 of the North Carolina Constitution. Here again, plaintiffs are complaining of the disparities resulting from the local supplements going to the wealthier districts as expressly authorized by Article IX, Section 2(2). Any disparity in school funding among the districts resulting from local subsidies is directly attributable to Article IX, Section 2(2) itself. Plaintiffs are essentially reduced to arguing that one section of the North Carolina Constitution violates another. It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself. This argument is without merit.

In another argument, plaintiff-intervenors contend that their relatively wealthy urban districts have been denied equal protection of the laws because there is no rational nexus between the current allocation of the state's portion of the funding for the school districts and the actual costs of providing students with educational services. This problem is especially acute in plaintiff-intervenors' districts, they contend, because they have greater numbers of students requiring special education programs than other districts. Plaintiff-intervenors complain that the current funding system does not take into consideration the amount of money required to educate particular students with special needs. Plaintiff-intervenors argue, therefore, that the state system providing supplemental state funding to poor and small school districts is arbitrary and denies students in plaintiff-intervenors' wealthy urban districts the equal protection of the laws guaranteed by Article I, Section 19.

Plaintiff-intervenors do not argue that the General Assembly may not provide supplemental state funds to some districts and not oth-

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

ers. Instead, they contend that the General Assembly has set up the programs for supplementing some but not all districts from purely state funds arbitrarily and without regard for the actual supplemental educational needs of particular school districts throughout the state.

**[6]** Because we conclude that the General Assembly, under Article IX, Section 2(1), has the duty of providing the children of every school district with access to a sound basic education, we also conclude that it has inherent power to do those things reasonably related to meeting that constitutionally prescribed duty. This power would include the power to create a supplemental state funding program which has as its purpose the provision of additional state funds to poor districts so that they can provide their students access to a sound basic education. However, a funding system that distributed state funds to the districts in an arbitrary and capricious manner unrelated to such educational objectives simply would not be a valid exercise of that constitutional authority and could result in a denial of equal protection or due process.

**[7]** We conclude that the Court of Appeals erred in reversing the trial court's denial of the motion to dismiss this claim by plaintiff-intervenors. Plaintiff-intervenors have made sufficient allegations in their complaint to entitle them to proceed to attempt to prove that the state supplemental funding system in question is unrelated to legitimate educational objectives and, therefore, is arbitrary and capricious. The Court of Appeals erred in holding to the contrary and in reversing the trial court's denial of defendants' motion to dismiss this claim for relief.

**[8]** In other arguments, plaintiff-parties contend that the Court of Appeals erred in holding that they had not made sufficient allegations in their complaints to state a claim for the violation of their rights under chapter 115C of the North Carolina General Statutes. We find it unnecessary to dwell at length on these arguments by plaintiff-parties, as even they agree that most of the sections of the statutes they rely upon do little more than codify a fundamental right guaranteed by our Constitution.

Specifically, plaintiff-parties allege in their complaints that the education system of North Carolina as currently maintained and operated violates the following requirements of chapter 115C: (1) that part of N.C.G.S. § 115C-1 requiring a "general and uniform system of free public schools . . . throughout the State, wherein equal oppor-

tunities shall be provided for all students"; (2) that part of N.C.G.S. § 115C-81(a1) requiring that the state provide "every student in the State equal access to a Basic Education Program"; (3) that part of N.C.G.S. § 115C-122(3) requiring the state to "prevent denial of equal educational . . . opportunity on the basis of . . . economic status . . . in the provision of services to any child"; and (4) that part of N.C.G.S. § 115C-408(b) requiring that the state "assure that the necessary resources are provided . . . from State revenue sources [for] the instructional expenses for current operations of the public school system as defined in the standard course of study." We conclude that none of the statutes relied upon by plaintiff-parties requires that substantially equal educational opportunities be offered in each of the school districts of the state. Instead, those statutes, at most, reiterate the constitutional requirement that every child in the state have equal access to a sound basic education. To the extent that plaintiff-parties can produce evidence tending to show that defendants have committed the violations of chapter 115C alleged in the complaints and that those violations have deprived children of some districts of the opportunity to receive a sound basic education, plaintiff-parties are entitled to do so. The Court of Appeals erred in its conclusion to the contrary.

As we have stated in this opinion, we conclude that the North Carolina Constitution does not guarantee a right to equal educational opportunities in each of the various school districts of the state. Therefore, the Court of Appeals was correct in concluding that the trial court erred in failing to dismiss plaintiff-parties' claims for relief based upon this purported right.

We have concluded, however, that the North Carolina Constitution does guarantee every child of the state the opportunity to receive a "sound basic education" as we have defined that phrase in this opinion. We have announced that definition with some trepidation. We recognize that judges are not experts in education and are not particularly able to identify in detail those curricula best designed to ensure that a child receives a sound basic education. However, it is the duty of this Court under the North Carolina Constitution to be the final authority in interpreting that constitution, and the definition we have given of a "sound basic education" is that which we conclude is the minimum constitutionally permissible.

We acknowledge that the legislative process provides a better forum than the courts for discussing and determining what educational programs and resources are most likely to ensure that each

child of the state receives a sound basic education. The members of the General Assembly are popularly elected to represent the public for the purpose of making just such decisions. The legislature, unlike the courts, is not limited to addressing only cases and controversies brought before it by litigants. The legislature can properly conduct public hearings and committee meetings at which it can hear and consider the views of the general public as well as educational experts and permit the full expression of all points of view as to what curricula will best ensure that every child of the state has the opportunity to receive a sound basic education.

We have concluded that some of the allegations in the complaints of plaintiff-parties state claims upon which relief may be granted if they are supported by substantial evidence. Therefore, we must remand this case to the trial court to permit plaintiff-parties to proceed on those claims.

[9] Educational goals and standards adopted by the legislature are factors which may be considered on remand to the trial court for its determination as to whether any of the state's children are being denied their right to a sound basic education. *See generally* William E. Thro, *Judicial Analysis During the Third Wave of School Finance Litigation: The Massachusetts Decision as a Model,* 35 B.C. L. Rev. 597 (1994). They will not be determinative on this issue, however.

Another factor which may properly be considered in this determination is the level of performance of the children of the state and its various districts on standard achievement tests. *See* Molly McUsic, *The Use of Education Clauses in School Finance Reform Litigation,* 28 Harv. J. on Legis. 307, 332 (1991). In fact, such "output" measurements may be more reliable than measurements of "input" such as per-pupil funding or general educational funding provided by the state. *Id.* at 329. It must be recognized, however, that the value of standardized tests is the subject of much debate. Therefore, they may not be treated as absolutely authoritative on this issue.

Another relevant factor which may be considered by the trial court on remand of this case is the level of the state's general educational expenditures and per-pupil expenditures. *Board of Educ., Levittown Union Free Sch. Dist. v. Nyquist,* 57 N.Y.2d 27, 48, 439 N.E.2d 359, 369, 453 N.Y.S.2d 643, 653 (1982), *appeal dismissed,* 459 U.S. 1139, 74 L. Ed. 2d 986 (1983). However, we agree with the observation of the United States Supreme Court that

### LEANDRO v. STATE OF NORTH CAROLINA

[346 N.C. 336 (1997)]

> [t]he very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. *Jefferson v. Hackney,* 406 U.S. [535], 546-547[, 32 L. Ed. 2d 285, 296 (1972)]. *On even the most basic questions in this area the scholars and educational experts are divided.* Indeed, one of the major sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education . . . .

*San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 42-43, 36 L. Ed. 2d 16, 48-49 (1973) (emphasis added).

More recently, one commentator has concluded that "available evidence suggests that substantial increases in funding produce only modest gains in most schools." William H. Clune, *New Answers to Hard Questions Posed by* Rodriguez: *Ending the Separation of School Finance and Educational Policy by Bridging the Gap Between Wrong and Remedy,* 24 Conn. L. Rev. 721, 726 (1992). The Supreme Court of the United States recently found such suggestions to be supported by the actual experience of the Kansas City, Missouri, schools over several decades. The Supreme Court expressly noted that despite massive court-ordered expenditures in the Kansas City schools which had provided students there with school "facilities and opportunities not available anywhere else in the country," the Kansas City students had not come close to reaching their potential, and "learner outcomes" of those students were "at or below national norms at many grade levels." *Missouri v. Jenkins,* 515 U.S. 70, ——, 132 L. Ed. 2d 63, 88-89 (1995).

We note that in every fiscal year since 1969-70, the General Assembly has dedicated more than forty percent of its general fund operating appropriations to the public primary and secondary schools. Marvin K. Dorman, Jr. and Robert L. Powell, N.C. Off. of State Budget & Mgmt., *Post-Legislative Budget Summary, 1996-97,* app. tbl. 11, at 154 (Oct. 1996); Fiscal Research Div., 1997 N.C. Gen. Assembly, *Selected Economic Revenue and Budget Data* (Feb. 11, 1997). During each of those same years, more than fifty-nine percent of the general fund operating appropriations were dedicated to overall public education, which includes community colleges and higher education. *Id.* Additionally, the Excellent Schools Act, which became effective when signed by Governor James B. Hunt, Jr., on 24 June

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

1997, will require additional large appropriations to the primary and secondary schools of the state. S.B. 272, 1997 N.C. Gen. Assembly (enacted June 24, 1997). Courts, however, should not rely upon the single factor of school funding levels in determining whether a state is failing in its constitutional obligation to provide a sound basic education to its children.

Other factors may be relevant for consideration in appropriate circumstances when determining educational adequacy issues under the North Carolina Constitution. The fact that we have mentioned only a few factors here does not indicate our opinion that only those factors mentioned may properly be considered or even that those mentioned will be relevant in every case.

[10] In conclusion, we reemphasize our recognition of the fact that the administration of the public schools of the state is best left to the legislative and executive branches of government. Therefore, the courts of the state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education. A clear showing to the contrary must be made before the courts may conclude that they have not. Only such a clear showing will justify a judicial intrusion into an area so clearly the province, initially at least, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education.

[11] But like the other branches of government, the judicial branch has its duty under the North Carolina Constitution. If on remand of this case to the trial court, that court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established. It will then become incumbent upon defendants to establish that their actions denying this fundamental right are "necessary to promote a compelling governmental interest." *Town of Beech Mountain v. County of Watauga,* 324 N.C. 409, 412, 378 S.E.2d 780, 782, *cert. denied,* 493 U.S. 954, 107 L. Ed. 2d 351 (1989). If defendants are unable to do so, it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government. *Corum v. University of N.C.,* 330 N.C. 761, 784, 413 S.E.2d 276, 291, *cert. denied,* 506 U.S. 985, 121 L. Ed. 2d 431 (1992).

For the foregoing reasons, the decision of the Court of Appeals is reversed in part and affirmed in part. This case is remanded to the Court of Appeals for further remand to the Superior Court, Wake County, for proceedings not inconsistent with this opinion.

REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.

Justice ORR dissenting in part and concurring in part.

I dissent from the portion of the majority opinion that holds that the alleged disparity in the educational opportunities offered by different school districts in this state does not violate Article IX, Section 2(1) of the North Carolina Constitution. I believe, for the reasons stated below, that if the allegations in plaintiffs' complaint are proven at trial, then the state's funding plan for public education would violate the "equal opportunities" clause set forth in our Constitution.

The majority advances two arguments in support of its ruling upholding the current method of state funding for the public school system. The first is that "Article IX, Section 2(2) of our Constitution expressly authorizes the General Assembly to require that local governments bear part of the costs of their local public schools." Second, the majority points out that, historically, local governments have played a significant role in funding our public school system. All of this is true.

However, the majority also views the role of local government as somehow reducing or eliminating the state's ultimate responsibility for funding our public schools. Thus, according to the majority logic, the unequal funding brought about by this system must have been anticipated by the framers of our Constitution. Therefore, no equal treatment in educational opportunities was ever intended. I disagree. The framers of our Constitution also provided, "The people have a right to the privilege of education, and it is the duty of the *State* to guard and maintain that right." N.C. Const. art. I, § 15 (emphasis added). The Constitution further provides that the *General Assembly* shall "provide by taxation and otherwise for a general and uniform system of free public schools." N.C. Const. art. IX, § 2(1) (emphasis added). It must be noted that in both of these constitutional provisions, the burden and responsibility is placed upon the state and the General Assembly. Nowhere is the constitutional responsibility for public education placed on local governments. In fact, the counties of North Carolina were created by the General Assembly as governmen-

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

tal agencies of the state. N.C. Const. art. VII, § 1. Counties are merely regarded as

> "agencies of the State for the convenience of local administration in certain portions of the State's territory, and in the exercise of ordinary governmental functions they are subject to almost unlimited legislative control, except when restricted by constitutional provision" . . . .

*Town of Saluda v. Polk County*, 207 N.C. 180, 183, 176 S.E. 298, 300 (1934) (quoting *Jones v. Commissioners*, 137 N.C. 579, 596, 50 S.E. 291, 297 (1905)).

The reliance by the majority on the language in Article IX, Section 2(2) of our Constitution that declares the General Assembly "*may assign to units of local government such responsibility for the financial support of the free public schools as they may deem appropriate*" (emphasis added) can in no way reduce the state's ultimate responsibility. Nor can the simple fact that local governments may use local revenue to "add or supplement" public school programs allow the state to avoid its constitutionally mandated obligation to "provide for a general and uniform system of free public schools." N.C. Const. art. IX, § 2(1).

Moreover, the majority contends that because local funding has been utilized throughout our state's history, any disparities in funding must have been anticipated by the framers of our Constitution. This argument cannot be maintained. I agree with the Tennessee Supreme Court's characterization of this reasoning as a " 'cruel illusion.' " *See Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 155 (Tenn. 1993) (quoting *Serrano v. Priest*, 18 Cal. 3d 728, 761, 557 P.2d 929, 948, 135 Cal. Rptr. 345, 364 (1976), *cert. denied*, 432 U.S. 907, 53 L. Ed. 2d 1079 (1977)). Local education funds are primarily generated through property taxes. If a county has a relatively low total assessed value of property, it has a barrier beyond which it cannot go in funding its educational system(s). Although these counties might impose a higher tax rate than their wealthier counterparts, their efforts cannot substitute for a lack of resources. The poorer counties simply cannot tax themselves to a level of educational quality that its tax base cannot supply. In those circumstances, the argument for local funding is a "cruel illusion" for those officials and citizens who are interested in a quality education for their children.

Although the majority opinion acknowledges the 1970 constitutional amendment to Article IX, Section 2(1) that added the phrase

"wherein equal opportunities shall be provided for all students," the majority apparently gives no significance to its meaning. Defendants, in their brief, contend that the phrase was adopted for the sole purpose of addressing racial segregation. *Britt v. N.C. State Bd. of Educ.*, 86 N.C. App. 282, 357 S.E.2d 432, *disc. rev. denied and appeal dismissed*, 320 N.C. 790, 361 S.E.2d 71 (1987). I disagree and believe that the majority fails to give this constitutional mandate the full scope of its meaning.

Contrary to the rationale presented in *Britt*, the 1971 constitutional framers removed existing language from the 1877 Constitution which mandated that "the children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor of, or to the prejudice of, either race." N.C. Const. of 1877, art. IX, § 2 (1969). The framers did not choose simply to remove the initial racially discriminatory language, but instead rewrote the constitutional language to provide for *"equal opportunities . . . for all students."* N.C. Const. art. IX, § 2(1) (emphasis added).

In arguing the phrase applies only to racial issues, the *Britt* court essentially violated a rule of statutory interpretation: " '[W]here the meaning is clear from the words used,' " courts should not search for a meaning elsewhere but rather should give meaning to the plain language of the constitution. *Martin v. North Carolina*, 330 N.C. 412, 416, 410 S.E.2d 474, 476 (1991) (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989)). To interpret the phrase "equal opportunities . . . for all students" as equal opportunities for only minority students creates a restrictive definition that the framers could not have intended. Indeed, in regard to education, our Constitution displays a deep concern for " 'ensur[ing] every child a fair and full opportunity to reach his full potential.' " *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 618, 264 S.E.2d 106, 113 (1980) (quoting N.C.G.S. § 115-1.1 (1978)) (recodified as N.C.G.S. § 115C-106 (1994)) (explaining the force of N.C. Const. art. IX, § 2(1) and N.C. Const. art. I, § 15). The Constitution, by its literal reading, means *all* students. It does not discriminate as to race, gender, handicap, economic status, or geography. Thus, students residing in a poorer district are still entitled to substantially equal educational opportunities as students in wealthier districts.

The majority also advances the rationale that plaintiffs' argument for equal educational programs and resources is not practical. This

## LEANDRO v. STATE OF NORTH CAROLINA

[346 N.C. 336 (1997)]

justification is based on the notion that identical funding and programs are unattainable. However, I believe that the phrase "equal educational opportunities," as advanced by plaintiffs, encompasses more than identical programs and funding for all the school districts in our state. The concept also addresses access to new textbooks, adequate facilities, other educational resources, and quality teachers with competitive salaries. The majority primarily focuses on the word "equal," interpreting this to mean "identical," and rejects the concept because of the fear of never-ending litigation. However, plaintiffs, in their brief, characterize equality as follows:

> [T]he concept of equality is never absolute. When used in the context of human relations, the notion of equality must take [into] account the fact that no two people and no two situations are in all respects exactly alike. We use the word equality to express a range within which things can and should be similar.

See *Horton v. Meskill*, 172 Conn. 615, 652, 376 A.2d 359, 375 (1977). Plaintiffs are essentially arguing that while perfect equality can never be achieved, much can be done to provide substantially equal opportunities. This description is consistent with *Black's Law Dictionary*, which defines "equality" as "[t]he condition of possessing *substantially* the same rights, privileges, and immunities." *Black's Law Dictionary* 536 (6th ed. 1990) (emphasis added). Thus, the phrase "equal opportunities," in practical terms, means substantially equal opportunities.

Therefore, the equality plaintiffs seek is not necessarily absolute and identical but, rather, is substantial equality. Although the concept of substantial equality is difficult to define, it is clear that a gross disparity in resources does not fall within its definition. For example, plaintiffs allege that many of their schools lack adequate classroom space and that they are forced to hold classes in hallways, cafeterias, libraries, and closets. Plaintiffs also argue that students in Wake County have science laboratories to conduct biology experiments; however, children in Hoke County must watch videos of others conducting the experiment because of lack of resources. Plaintiffs also point to several less obvious disparities: lack of sewer connections and problematic waste water disposal, leaking roofs that cause extensive damage and sometimes require classrooms to be closed during heavy rains, and lighting systems and acoustics that are often poor and inadequate. Plaintiffs also allege that higher teacher pay supplements in the wealthier counties make it more difficult for them

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

to attract the best teachers to their schools. The result of the above inadequacies is that in basic courses such as math, history, and English, more than 80% of the students in plaintiffs' counties are failing. If these allegations are true, these students may not even be receiving the sound basic education that the majority mandates. It also reflects the fact that there is a wide disparity between the wealthier and poorer counties. Can it be rationally argued that students from economically disadvantaged school districts with outdated texts, aging buildings, limited resources, and teachers at the lower end of the wage scale are receiving substantially equal educational opportunities with those students from well-financed school districts with state-of-the-art facilities? The answer is as obvious as is the constitutional mandate that there be "equal opportunities . . . for all students." N.C. Const. art. IX, § 2(1).

The notion of substantial equality in educational opportunities for all students is not a novel concept. *See, e.g., McDuffy v. Secretary of Exec. Office of Educ.*, 415 Mass. 545, 615 N.E.2d 516 (1993); *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139. Even our constitutional framers addressed this issue. They commented that the Constitution was designed to *"level upwards,* to *every* child, as far as the State can, an opportunity to develop to the *fullest* extent, all his intellectual gifts. So noble an effort, needs no vindication." *Journal of the Constitutional Convention of the State of North Carolina* 487 (1868) (emphasis added). Three years later, this Court pronounced in *Lane v. Stanly*, 65 N.C. 153 (1871), that Article IX provides that the state public school system

> will be observed as a "system"; it is to be "general," and it is to be "uniform." It is not subject to the caprice of localities, but *every locality, yea every child, is to have the same advantage* . . . .
>
>      . . . .
>
> [Otherwise,] [i]n some townships there would be no schools, in others inferior ones, and in others extravagant ones, to the oppression of the taxpayers. There would be no "uniformity" and but little usefulness, and *the great aim of the government in giving all of its citizens a good education would be defeated.*

*Id.* at 157-58 (emphasis added). In essence, I believe that our constitutional framers intended for *all* students to have equal access to public schools and substantially equal educational opportunities. To conclude otherwise would create arbitrary boundaries on educa-

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

tional opportunities based on geographical lines and local funding circumstances.

In evaluating plaintiffs' claim under Rule 12(b)(6), the facts alleged are to be taken as true, *Embree Const. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 490, 411 S.E.2d 916, 919-20 (1992), and a complaint should not be dismissed "unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim," *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970). In our case, statistics employed by both plaintiffs and the state show, for example, that for the 1990-91 fiscal year, the funding for operation of the state's public school system came from the following sources: state funds (66.1%), local funds (24.5%), federal funds (6.6%), and private funds (2.8%). National Ctr. for Educ. Statistics, U.S. Dep't of Educ., *Digest of Education Statistics*, tbl. 157, at 152 (1993). For capital outlay expenditures, the allocation was as follows: state funds (9%), local funds (90%), and federal funds (1%). Public Schools of N.C., State Bd. of Educ., *N.C. Public Schools Statistical Profile*, tbl. 30, at 58 (1993) (citing 1991-92 fiscal year statistics). These statistics show without question that a sizeable portion of funding, particularly in the area of capital outlays, falls upon local governments. Consequently, wealthier counties are more capable of meeting their educational needs than are economically disadvantaged counties. These allegations, if true, are more than adequate to state a claim under both the right to a sound basic education and the right to a substantially equal opportunity to get the best education possible.

By the above discussion, I do not contend that the state must necessarily assume complete control over educational allocations. The General Assembly still has the discretion to allocate this responsibility between the state and local governments. Yet it must be reemphasized that the inability or indifference of local governments to provide funds does not excuse the General Assembly from a duty specifically imposed on it by the Constitution.

In closing, we should reflect upon the history of education in North Carolina. The control over education has often been fraught with political overtones of class, race, and gender. In the early 1900s, the New South movement led a classroom revolution to reform the existing education system. Since that turning point, reformers have espoused a platform of simple justice and equality in an effort to ensure a quality education for all children. *See generally* James L.

**LEANDRO v. STATE OF NORTH CAROLINA**

[346 N.C. 336 (1997)]

LeLoudis, *Schooling the New South* (1996). This process has been long and arduous. As Robert Ogden, a leading reformer in the early 1900s, explained: "[T]he work must be thorough-going, because we wish gradually to change . . . an outworn system of society." *Id.* at 146.

The essential issue in this debate concerns substantial equality of educational opportunities. The issue is not, as the majority argues, simply equality of funding. It is the sole responsibility of the General Assembly to formulate and implement the North Carolina public education system. The state's ultimate responsibility for education under the Constitution cannot be delegated. The specific duties implementing the responsibility are assignable, but the responsibility *per se* is not. Therefore, any assignment of authority to local governments fails to relieve the state of its responsibility to provide substantially equal educational opportunities to all students. I believe the majority erred in holding that the North Carolina Constitution does not entitle students in all school districts to substantially equal educational opportunities. In this case, plaintiffs have alleged substantial disparities in educational opportunities between wealthier and poorer counties based upon the state's funding system. These are sufficient allegations to state a claim and, if proven true, would entitle plaintiffs to relief.

Because I am unable to join the majority's decision regarding the issue of equal opportunities, I respectfully dissent in part as to this and related issues. I concur, however, with the analysis and results reached by the majority in the remainder of the opinion that does not deal with substantially equal educational opportunities.