PARIENTE, J., dissenting.
I dissent. With its decision today, the majority of this Court fails to provide any judicial remedy for the students who are at the center of this lawsuit-African-American students, Hispanic students, economically disadvantaged students, and students who attend school in poorer school districts or attend persistently low-performing schools. The majority of this Court eviscerates article IX, section 1, of the Florida Constitution, contrary to the clear intent of the voters, and abdicates its responsibility to interpret this critical provision and construe the terms "uniform," "efficient," and "high quality," enshrined in that provision. Today, even more emphatically than before the 1998 amendment to article IX, section 1, I echo the words of Justice Anstead, joined by Justices Kogan and Shaw: "By [the Court's] action today, we have reduced to empty words a constitutional promise to provide an adequate educational system for our children." Coalition for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles , 680 So.2d 400, 410 (Fla. 1996) (Anstead, J., dissenting).
Article IX, section 1 became one of the strongest education provisions in the country when, in 1998, the voters of this State approved an amendment, which designated the education of children "a fundamental value of the people of the State of Florida" and placed "a paramount duty [on] the state" to provide a "uniform, efficient, safe, secure, and high quality system of free public schools" for Florida's students. Art. IX, § 1(a), Fla. Const. That amendment, a product of the 1998 Constitution Revision Commission, was intended to remedy the Court's 1996 opinion in Coalition , which held that article IX, section 1 did not provide judicially manageable standards for the courts to adjudicate claims brought under the provision. 680 So.2d at 407-08.
In this case, Petitioners-a group of public school parents, students, and citizen organizations-brought a declaratory action against the State, alleging that the State is violating its constitutional obligation to provide all students with a uniform, efficient, and high quality education system. The trial court held a four-week long bench trial, at which evidence was presented that, in 2014, only 58% of Florida students across all grades scored on grade level on statewide reading assessments; that number was only 56% for statewide math assessments. Petrs.' Initial *146 Br. at 4.[11] To properly understand these statistics, "grade level" means only that a student's performance is at least "satisfactory;"[12] which also signifies that the student "may need additional support for the next grade/course."[13] These figures are on average lower for African-American students, Hispanic students, and economically disadvantaged students.
In what judicial universe do the facts presented demonstrate that the State is fulfilling its constitutional obligation to provide a "uniform," "efficient," and "high quality" education?[14] By holding that a claim like Petitioners'-which alleged wide disparities in performance among certain subgroups of students and persistently low-performing schools-cannot be adjudicated by the courts, the majority of this Court renders article IX, section 1, a "hollow phrase[ ] of nothingness." Dissenting op. at 162 (Lewis, J.). Indeed, the effect of the plurality's holding is to deny Petitioners the opportunity to establish in a court of law that the State has failed to live up to its paramount constitutional obligation set forth in article IX, section 1.[15]
For these and all the reasons that follow, I dissent from the conclusion of the majority of this Court that the claim raised by Petitioners in this case is not justiciable. I also concur with Justice Lewis's excellent explanation of justiciability and why this particular controversy is justiciable. See generally dissenting op. (Lewis, J.).
Petitioners' Claim
The plurality opinion is premised on a basic mischaracterization of Petitioners' claim as one to "have the State of Florida's K-12 public education system declared unconstitutional." Plurality op. at 128. This mischaracterization sets the stage for the rest of the plurality's opinion, including its conclusion that Petitioners' claim is non-justiciable.
Contrary to the plurality's contention, Petitioners' claim is not "a blanket challenge to the constitutionality of the K-12 education system." Plurality op. at 135.
*147 Rather, Petitioners allege that the State has violated its constitutional obligation under article IX, section 1 in specific ways. Most notably, Petitioners allege that the State has failed to address wide disparities in performance among certain subgroups of students-specifically, African-American students, Hispanic students, students experiencing poverty, and students attending school in poorer school districts-as well as persistently low-performing schools. In support of their claim, Petitioners set forth detailed statistics, which show, for example, "disparities in reading achievement by subgroup as only 38% of Black students passed reading; 54% of Hispanic students; 19% of English Language Learners (ELL); 47% of students receiving Free-Reduced Lunch (FRL) (a proxy for poverty); and 37% of homeless students." Petrs.' Initial Br. at 4 (footnotes omitted). These statistics demonstrate that disparities do not just exist among certain subgroups of students, but also between school districts. For example:
The statewide average passing rate for reading for third graders is 56%, and 55% for tenth graders. In St. Johns, 76% of third graders and 75% of tenth graders passed reading. Hamilton has the lowest overall reading passing rate for third graders at 35% of students. The lowest reading rate for tenth graders was Gadsden with 26%. Thus, the difference in reading rates among districts in third grade is 41 percentage points, and 49 in tenth grade.
On the 8th grade math assessment, Bradford had the lowest passing rate at 5% overall, 0% for Black students, 6% for FRL, and 0% for students with disabilities.
In 2015, Franklin had the lowest graduation rate at 49%, and three other school districts were below 60%. In contrast, St. Johns and three other districts had graduation rates over 90%, and Dixie had the highest at 96.9%. The difference in graduation rates between Franklin and Dixie was almost 48 percentage points. One of the State's measures of college readiness shows a statewide average of 27%, with disparities ranging from St. Johns at 55% versus Hamilton with 1%.
Id. at 5 (footnotes omitted). The accuracy of these statistics are not challenged.
Further, Petitioners set forth statistics showing that, among other things, "28 schools (all serving high poverty students) ... are persistently low-performing (5 or more years as F)." Id. at 6. In fact, despite concluding that Petitioners' claim was non-justiciable, the trial court in this case expressed particular concern about the issue of persistently low-performing schools:
[T]he Court must note that it was surprised at how long a school could remain in "F" status pursuant to the enactments of the legislature. If there is one area that this Court was most concerned about based on the evidence heard, it is in the area of Differentiated Accountability. There can be little doubt that allowing a school to remain in F status for an extended period of time raises serious issue regarding the constitutional acceptance of such an event.... To bring the matter to a point, I would raise the following question. How many people would want a judge deciding or presiding over their lawsuit in a Circuit that had been rated by the Supreme Court with an "F" as to judicial performance for many years? Similarly, parents do not want their children attending a school that continues to receive an "F" based on its performance rating. The evidence presented, while not rising to the level of a constitutional violation, should serve as a warning not to be complacent about a local districts *148 [sic] failure to address long term "F" schools. This is especially true since the Defendants [sic] own evidence shows that an "F" school can be turned around without additional resources being provided.
Final J. at 13-14.
The trial court also expressed concern over the State's "handling of local School Districts [sic] failure to address the problem of long term 'F' schools at the local level," stating that "[a]t some point in time the State Board should do more if the local School District will not." Findings of Fact at 70. Thus, contrary to the plurality's contention, Petitioners' claim is not a "blanket challenge" to the entire state education system but, rather, a claim that the State is violating its constitutional obligation in specific ways-most significantly, by failing to address wide disparities in performance among certain subgroups of students and schools.
Petitioners' Claim Brought Under Article IX, Section 1 Is Justiciable
I completely agree with Justice Lewis that this Court "ha[s] a responsibility to interpret and apply the rights and principles set forth in the Constitution, including article IX, section 1(a)." Dissenting op. at 157 (Lewis, J.). This responsibility includes adjudicating controversies brought under article IX, section 1.
To conclude that the claim presented is not capable of judicial resolution would "reduce to empty words a constitutional promise to provide an adequate educational system for our children." Coalition , 680 So.2d at 410 (Anstead, J., dissenting). While deference to the Legislature and separation of powers are clearly important constitutional principles, this Court cannot use those principles to escape its obligation to interpret provisions of the Florida Constitution and enforce the rights it grants to the citizens of this state. See League of Women Voters v. Detzner , 172 So.3d 363, 400 (Fla. 2015) ("While the Legislature is generally entitled to deference as a result of its role in the redistricting process, that deference applies only 'so long as [its redistricting] decision[s] do[ ] not violate the constitutional requirements." (alterations in original) (quoting In re Senate Joint Res. of Legislative Apportionment 1176 , 83 So.3d 597, 599 (Fla. 2012) ( Apportionment I ) ) ).
In 2012, for example, this Court was tasked with defining for the first time the new standards set forth in the Fair Districts Amendment, which had been approved by voters two years earlier. See generally Apportionment I , 83 So.3d 597. This Court did not shy away from the task, but rather recognized its "extremely weighty responsibility" entrusted to it "by the citizens of this state through the Florida Constitution to interpret the constitutional standards and to apply those standards to the legislative apportionment plans." Id. at 599. Just as the Court was able to define the terms in the Fair Districts Amendment, it is equally able to define the terms in article IX, section 1.
In concluding that Petitioners' claim is not justiciable, the First District Court of Appeal "respectfully disagree[d]" with other state supreme courts that have found similar claims justiciable. Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ. , 232 So.3d 1163, 1172 (Fla. 1st DCA 2017). Instead, the First District relied on Marrero v. Commonwealth , 559 Pa. 14, 739 A.2d 110, 112-13 (1999), where the Pennsylvania Supreme Court held that such a claim was non-justiciable. See Citizens for Strong Sch. , 232 So.3d at 1172. Three months before the First District's decision, however, the Pennsylvania Supreme Court declined to follow its decision in Marrero and held that Petitioner's challenge *149 to the education system based on the state constitution was justiciable. William Penn Sch. Dist. v. Pa. Dep't of Educ. , 642 Pa. 236, 170 A.3d 414, 457 (2017). In declining to follow Marrero , the Pennsylvania Supreme Court explained:
To the extent that our prior cases have suggested, if murkily, that a court cannot devise a judicially discoverable and manageable standard for Education Clause compliance that does not entail making a policy determination inappropriate for judicial discretion, or that we may only deploy a rubber stamp in a hollow mockery of judicial review, we underscore that we are not bound to follow precedent when it cannot bear scrutiny, either on its own terms or in light of subsequent developments.
Id. at 456. Thus, in holding that article IX, section 1 of our state constitution does not provide judicially manageable standards, the First District relied on outdated and overruled precedent, to the exclusion of the majority of other state supreme courts.
Although the plurality does not go so far as to say that a claim under article IX, section 1 could never be justiciable, it nevertheless concludes that Petitioners' claim in this case is not justiciable. See plurality op. at 135. In reaching this conclusion, the plurality, without explanation-like the First District-declines to consider other jurisdictions that have found similar claims justiciable. See id. at 19. Instead, the plurality limits itself "to the language of the Florida Constitution and this Court's decisions," ignoring the reasoning of the majority of other state supreme courts that have held that similar claims under their respective state constitutions are justiciable. Id.[16] Indeed, those courts adjudicated similar claims even though many of the education constitutional provisions in their state constitutions are less detailed than ours.[17]
*150 In concluding that a claim similar to Petitioners' in this case was justiciable, the Supreme Court of Kentucky wrote: "The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the ... Constitution as necessitated by the controversies before it. It is solely the function of the judiciary to so do." Rose , 790 S.W.2d at 209. Likewise, in declining to follow its earlier precedent, the Supreme Court of Pennsylvania explained the importance of the court's judicial review function:
Two decades after Marbury [v. Madison , 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803) ], in another paean to the importance of judicial review, Chief Justice Marshall cautioned that "[t]he judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the [C]onstitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us." Cohens v. Virginia , 19 U.S. 264, 404, 6 Wheat. 264, 5 L.Ed. 257 (1821). The spirit of Chief Justice Marshall's cautionary refrain has informed the clear majority of state courts that have held it their judicial duty to construe interpretation-begging state education clauses like ours to ensure legislative compliance with their constitutional mandates, no matter the difficulties invited or, in many cases, confronted. We hold that our Education Clause, viewed in the overarching context of our cases taking up the question of abstention from political questions, compels the same result.
William Penn , 170 A.3d at 463.
In support of its conclusion in this case, the plurality attempts to distinguish this Court's precedent in Bush v. Holmes , 919 So.2d 392 (Fla. 2006), reasoning that Holmes addressed a narrow question involving a specific voucher program. See plurality op. at 139. However, nothing in Holmes suggests that its reasoning applies only to specific education program challenges. In fact, in Holmes , we clearly stated that the entire purpose of the 1998 amendment to article IX, section 1 was to "provide standards by which to measure the adequacy of the public school education provided by the state." 919 So.2d at 403. And it was because the 1998 amendment added judicially manageable standards that this Court was able to determine whether the program at issue in Holmes violated article IX, section 1. Id. at 409. Just as in Holmes , a court can use the judicially manageable standards added to article IX, section 1 in 1998 to determine whether the State has violated its obligation in the context of Petitioners' claim in this case.
As an additional justification for concluding that Petitioners' claim is not justiciable, the plurality reasons that the claim "does not survive the reasoning in Coalition ." Plurality op. at 135. But this ignores the purpose of the 1998 amendment, which was to provide judicially manageable standards so that, in the future, courts would be equipped to evaluate alleged constitutional *151 violations. See Holmes , 919 So.2d at 403.
The plurality's main contention with Petitioners' claim appears to be that they failed to present a judicially manageable standard that would allow this Court to consider their claim in a way that avoids judicial intrusion into the functions of the legislative and executive branches. See plurality op. at 141. This misunderstands Petitioners' claim as well as the judiciary's role. Petitioners do not ask the judiciary to recreate Florida's education system. Rather, they ask the judiciary to adjudicate whether, in light of the performance statistics they have presented and the State's statutory standards, the State has violated its constitutional obligation under article IX, section 1.
Article IX, Section 1 Provides Judicially Manageable Standards
As this Court stated almost ninety years ago, "[t]he object of constitutional construction is to ascertain and effectuate the intention and purpose of the people in adopting it." Amos v. Mathews , 99 Fla. 1, 65, 115, 126 So. 308, 316 (1930). This Court has reiterated that principle on multiple occasions. See, e.g. , Apportionment I , 83 So.3d at 599 ("When interpreting constitutional provisions, this Court endeavors to ascertain the will of the people in passing the amendment."); Pleus v. Crist , 14 So.3d 941, 944-45 (Fla. 2009).
Indeed, in asserting that the State has violated its constitutional obligation, Petitioners explain that the State has already determined what a high quality education is and how to measure it. They cite, for example, section 1003.41, Florida Statutes (2017), which sets forth the "core content knowledge and skills that K-12 public school students are expected to acquire." § 1003.41, Fla. Stat. (2017). In conjunction with the core content students are expected to learn, the Legislature has tasked the Commissioner of Education with "design[ing] and implent[ing] a statewide, standardized assessment program aligned to the core curricular content" established in section 1003.41. Id. § 1008.22(3). The State Board of Education then sets "a passing score for each statewide, standardized assessment." Id. § 1008.22(3)(e)2.
Further, Petitioners cite section 1000.03(5)(d), which prioritizes that "[a]cademic standards for every level of the K-20 education system are aligned, and education financial resources are aligned with student performance expectations at each level of the K-20 education system." Id. § 1000.03(5)(d). However, Petitioners argue that "[n]either the Legislature nor the Department of Education has ensured that education financial resources are aligned with student performance expectations as required by statute." Petrs.' Initial Br., at 9 (citing § 1000.03(5)(d) ). This claim is very different than simply asking that the State allocate additional funding; rather, it is about the "efficient" use of the resources provided based on evidence-based practices that is critical to the success of all students. Thus, Petitioners do not ask the judiciary to re-create the state education system, but only to determine whether the State has complied with its constitutional obligation under its own standards in light of the fact that many students-particularly certain subgroups of students-are failing to meet the standards set by the State.
The plurality contends that Petitioners' reliance on the State's own standards is "foundationally flawed" because "adopting State standards as constitutional minima would have the perverse effect of encouraging the weakening of curriculum standards in order to achieve higher passage rates and to satisfy court-imposed requirements." Plurality op. at 142 (quoting Br. of Amicus Foundation for Excellence in *152 Educ. in Support of Resps., at 13-14).[18] The reasoning is faulty. If the State were to intentionally adopt low standards to achieve higher pass rates, those standards could be challenged as a violation of the State's constitutional obligation to provide a "high quality" education. Simply because Petitioners in this case do not challenge the standards set by the State does not render their claim non-justiciable.
In my view, using the State's own standards, a court could evaluate Petitioners' claim by construing the judicially manageable terms set forth in article IX, section 1, as other state supreme courts have done with their respective state constitutions. See, e.g. , Rose , 790 S.W.2d at 211 ; Davis v. State , 804 N.W.2d 618, 623-24 (S.D. 2011) ; Campbell Cty. Sch. Dist. v. State , 907 P.2d 1238, 1259 (Wyo. 1995). And, while the definitions set forth below could generally apply to any claim brought under article IX, section 1 they are construed here in the context of Petitioners' claim, which does not include a challenge to the constitutionality of the State's standards.
Uniformity
When defining constitutional terms, it is appropriate to utilize dictionary definitions. See Apportionment I , 83 So.3d at 632 ; see also, e.g. , Lobato , 218 P.3d at 375 ; Davis , 804 N.W.2d at 624. "Uniform" is defined as "having always the same form, manner, or degree: not varying or variable" or "consistent in conduct or opinion." Merriam-Webster , https://www.merriam-webster.com/dictionary/uniform (last visited Dec. 17, 2018).
In 1997, construing the 1968 version of article IX, section 1, this Court concluded that a "uniform" system is one that "operate[s] subject to a common plan or serve[s] a common purpose." Sch. Bd. of Escambia Cty. v. State , 353 So.2d 834, 838 (Fla. 1977) (emphasis added). Thereafter, we explained that "uniformity," as used in article IX, section 1, "requires that a system be provided that gives every student an equal chance to achieve basic educational goals prescribed by the legislature." St. Johns Cty. v. Ne. Fla. Builders Ass'n , 583 So.2d 635, 641 (Fla. 1991) ; see also Rose , 790 S.W.2d at 211 ("Each child ... must be provided with an equal opportunity to have an adequate education.").
Significantly, in defending against the plaintiffs' claim in Coalition , the State conceded in this Court that "the phrase 'uniform' has manageable standards because by definition this word means a lack of substantial variation." 680 So.2d at 408. Further construing this term in Holmes , this Court concluded that the Opportunity Scholarship Program at issue violated article IX, section 1 because it "reduce[d] money available to the free schools" and "fund[ed] private schools that [we]re not 'uniform ' when compared with each other or the public system." 919 So.2d at 398 (emphasis added).
*153 Importantly, as Justice Kogan explained, the uniformity requirement of article IX, section 1"is not and never was intended to require that each school district be a mirror image of every other one." Fla. Dep't of Educ. v. Glasser , 622 So.2d 944, 950 (Fla. 1993) (Kogan, J., specially concurring). Rather, "variance from county to county is permissible so long as no district suffers a disadvantage in the basic educational opportunities available to its students, as compared to the basic educational opportunities available to students of other Florida districts." Id. (emphasis added). Other state supreme courts have expressed similar understandings of the term "uniform," as used in this context. E.g. , Lobato , 304 P.3d at 1138 (defining "thorough and uniform" in the state's constitution as "a free public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state"); Leandro , 488 S.E.2d at 255-56 (concluding that the right ensures that all children enjoy the right but does not require equal funding among the school districts).
These definitions provide a workable standard by which courts can determine whether the State has fulfilled its paramount duty under article IX, section 1. In this case, a court could apply these definitions and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.
Efficient
"Efficient" is defined as "productive of desired effects." Merriam-Webster , https://www.merriam-webster.com/dictionary/efficient (last visited Dec. 17, 2018). Also looking to dictionary definitions, the Supreme Court of Wyoming defined "efficient" in this context as "productive without waste." Campbell , 907 P.2d at 1258-59 (quoting Webster's Collegiate Dictionary (10th ed. 1994) ); see also Edgewood Independent Sch. Dist. v. Kirby , 777 S.W.2d 391, 395 (Tex. 1989) (defining "efficient" as "the use of resources so as to produce results with little waste"). The Supreme Court of Kentucky went further, defining "efficient," as used in its state constitution, as a system that is not only "operated with no waste, no duplication, no mismanagement, and with no political influence," but also, "provide[s] funding which is sufficient to provide each child in Kentucky an adequate education." Rose , 790 S.W.2d at 212-13.
Currently, the State uses a complex funding formula-the Florida Education Finance Program (FEFP)-that includes both state and local funds and considers many factors, including but not limited to economic disparity, cost of living, and population, to determine how much money to allocate to each school district. See generally § 1011.62, Fla. Stat. (2018). Petitioners do not challenge the amount of funding but, rather, assert that the State has failed to ensure that its allocations are the best use of funding. Petitioners allege that the State is not funding schools in an efficient manner, as required by article IX, section 1. See Second Am. Complaint at 19 ("Many of the State's reforms and programs ... have wasted millions of dollars without producing the desired effect of a high quality public school system, and are thus not efficient.").
Accordingly, "efficient," as used in article IX, section 1 should be defined to mean that the State must allocate resources in a productive manner and without waste. In this case, a court could apply this definition of "efficient," and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.
*154 High Quality
Finally, perhaps the most critical term in article IX, section 1 must be construed. "Quality" is defined as "degree of excellence." Merriam-Webster, https://www.merriam-webster.com/dictionary/quality (last visited Dec. 17, 2018). "High," of course, modifies the word "quality" to demand something more than average quality. In defining this term, we are cognizant of the fact that the term "high quality" is used twice in article IX, section 1. "Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education ...." Art. IX, § 1, Fla. Const. (emphasis added). The plain language of the provision requires the State to not only provide a high quality system , but also allow students to obtain a high equality education .
As the Supreme Court of North Carolina has explained, courts may look to "[e]ducational goals and standards" set forth by the Legislature for determining whether the State has met its constitutional obligation. Leandro , 488 S.E.2d at 259. Indeed, the Florida Legislature has already defined "high quality" by providing substantive content standards for students. As an example, the State prioritizes students' preparation for postsecondary education without remediation. § 1000.03(5)(a), Fla. Stat. (2018). The State also prioritizes students' preparation "to become civically engaged and knowledgeable adults who make positive contributions to their communities." Id. § 1000.03(5)(c).
Accordingly, for purposes of the controversy before us, "high quality" means an education system that allows all students an equal opportunity to learn the core content knowledge set by the State and become knowledgeable and engaged adults. In this case, a court could apply this definition of "high quality" and determine whether, in the context of Petitioners' claim, the State has violated its constitutional obligation under article IX, section 1.
Thus, contrary to the plurality's contentions, using basic rules of statutory construction-including looking to the dictionary to determine plain meaning-the terms in article IX, section 1 are fully capable of being construed by the courts. Reading these definitions together, a court would be perfectly capable of determining whether, under the facts presented, the State has fulfilled its "paramount" constitutional duty to make "adequate provision" for a "uniform, efficient ... and high quality system of free public schools" for Florida's children. Art. IX, § 1, Fla. Const. In this case, because the trial court concluded that article IX, section 1 did not provide judicially manageable standards and used the wrong evidentiary standard for evaluating the petitioners' claim, I would remand the case back to the trial court to reconsider the evidence and Petitioners' claim in light of these definitions.
No Independent Basis Exists for Rejecting Petitioners' Claim
As an "independent basis" for rejecting Petitioners' claim, the plurality concludes that "on the record presented here the Petitioners still could not prevail." Plurality op. at 142. In support of this conclusion, the plurality notes the trial court's finding that Petitioners "failed to establish any causal relationship between any alleged low student performance and a lack of resources," and that "the weight of the evidence ... establishes a lack of any causal relationship between additional financial resources and improved student outcomes." Id. at 143. However, even though the trial court used the phrase "weight of the evidence," it made clear *155 that, to prevail, Petitioners would have to show that the State's actions "are irrational or unconstitutional beyond a reasonable doubt." Final J. at 24.
Although the trial court ultimately concluded that Petitioners failed to establish causation, significant evidence was presented, indicating that when additional resources were allocated to low-performing schools, those schools improved. In fact, the State's own expert agreed with Petitioners that more resources are needed to educate African-American students, Hispanic students, and students in poverty. That very expert has written articles on the fact that state education systems "should ... effectively use more resources for poor kids." The State's expert further agreed with Petitioners' contention that money matters when it is spent efficiently, testifying: "Effective use by management, the funds will be effective."[19] This is logical given that the students who perform the lowest on statewide assessments generally attend schools in poorer school districts.
Indeed, only 5% of 8th graders in Bradford County passed the statewide mathematics assessment, with a pass rate of 0% among African-American students. Petrs.' Initial Br. at 5. That's correct: Zero. None. And only 26% of the 10th graders in Gadsden County passed the statewide reading assessment. Id. On the other hand, in St. Johns County, one of the State's wealthier school districts, 76% of 3rd graders and 75% of 10th graders passed the statewide reading assessment. Id.
Additionally, the trial court reached its conclusion on causation only after determining that the terms in article IX, section 1, were not capable of judicial construction. In other words, the trial court's conclusion on causation is based on a flawed premise-that article IX, section 1 does not provide judicially manageable standards-and an improper evidentiary standard, beyond a reasonable doubt. Thus, because the trial court's findings on the merits were made in a constitutional vacuum, they are not entitled to deference.
Based on the evidence presented, Petitioners have made a strong showing that the State has failed to provide a "high quality" and "efficient" education to all of Florida's students. Thus, we cannot presume that if this case were remanded to the trial court to reconsider the evidence and Petitioners' claim using these definitions and the proper evidentiary standard, the trial court would reach the same conclusion. Accordingly, I disagree that the trial court's finding that Petitioners' "failure to establish such a causal relationship provides an independent basis for rejection of their claims." Plurality op. at 143.
We Should Remand this Case to the Trial Court to Reconsider the Evidence and Petitioners' Claim in Light of These Definitions
In concluding that the State has not violated its constitutional obligation, the trial court observed that in 2014, 58% of students across grades 3 through 10 scored at or above grade level in reading, "a two percentage point improvement over 2011." Findings of Fact at 81. The trial court further found that, in 2001, only 47% of students were reading at or above grade level. Id. at 80. The trial court also devoted eight pages to comparing Florida's results to other states' results. See id. at 71-79. However, in my view, "adequate provision," as used in article IX, section 1, is an objective standard that does not consider *156 improvements that have been made or what other states are doing. Further, it is hard to understand how objectively Florida compares to other states that might not even have the "high quality" education mandate in their constitutions when it ranks 29th overall in education and its per-pupil spending falls well below the national average. See supra note 15.
Instead of focusing on improvements over the years or state-by-state comparisons, the trial court should have considered the statewide deficits on achievement in reading and math.[20] While it cannot be disputed that Florida has made improvements, the evidence, as found by the trial court, still shows that only a bare majority of Florida's children are reading at grade level; 42% are below grade level. Again, I must ask: In what judicial universe does the set of facts presented demonstrate that the State is fulfilling its constitutional obligation to provide a "uniform," "efficient," and "high quality" education?
Using the definitions provided and the State's own standards as a measuring stick, the trial court could very well have concluded on remand that the State has violated its constitutional obligation under article IX, section 1 thereby entitling Petitioners to a declaratory judgment. The trial court could then have heard arguments on the appropriate remedy.[21]
Certainly, I recognize that the task of making adequate provision for a high quality education is primarily for the Legislature. We are not legislators. We are justices charged with enforcing the rights set forth in Florida's Constitution. That is why with article IX, section 1 the citizens of this State intended for compliance-or noncompliance-with that provision to be adjudicated by the judiciary when properly brought to the court. Indeed, the task of construing the constitution and determining whether the State is fulfilling its express obligations required by the constitution-and the citizens of this State who approved the relevant constitutional language-is solely the judiciary's task. "This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public." Rose , 790 S.W.2d at 209.
CONCLUSION
The significance of education both to the success of our children and to a functioning democracy cannot be overstated. The drafters of Florida's Constitution recognized this fact "and, accordingly, included the education provision to guarantee that a system of free public education be established for the citizens of Florida." Coalition , 680 So.2d at 409 (Overton, J., concurring). That guarantee means nothing, however, without a judicial branch willing to perform its constitutional duty.
With its decision today, "this Court has failed to carry out its duty to ensure that the legislature" and the executive branch *157 have complied with their constitutional obligation under article IX, section 1. Id. at 410 (Anstead, J., dissenting). The plurality has abdicated its responsibility to interpret the constitution and eviscerated article XI, section 1 contrary to the clear intent of the voters. And, at the center of this dispute are the students who are at the greatest risk of failing-African-American students, Hispanic students, economically disadvantaged students and school districts, and students attending persistently low-performing schools.
Because I would conclude that Petitioners' claim is justiciable and would allow them the opportunity to establish that the State is violating its constitutional obligation, I dissent.
LEWIS and QUINCE, JJ., concur.

2014 provides the most recent results from the record. See Petrs.' Initial Br. at 4.

§ 1008.22(3)(e)1., Fla. Stat. (2018); see id. § 1008.34(1)(a).

Florida Standards Assessments, Understanding Florida Standards Assessments Reports 4 (2018), https://fsassessments.org/core/fileparse.php/4344/urlt/Understanding_FSA_Reports_2018_041918_Final.pdf.

Although counsel for the Department of Education alleged during oral argument that student performance in Florida is superior to student performance in New Jersey, where the New Jersey Supreme Court first granted relief in Abbott v. Burke , 119 N.J. 287, 575 A.2d 359 (1990), the facts show otherwise. According to the 2017 report card issued by the Education Week Research Center, New Jersey ranked second in the nation overall in education, while Florida ranked 29th. See Samuel Stebbins & Thomas C. Frohlich, Geographic Disparity: States with the Best (and Worst) Schools , USA Today (Feb. 8, 2018), https://www.usatoday.com/story/money/economy/2018/02/08/geographicdisparity-states-best-and-worst-schools/1079181001/.

The plurality refuses to look at the jurisprudence of other state supreme courts addressing similar constitutional provisions. And, while Florida's education system should not necessarily be compared to other states, it is worth noting that, as of February of this year, Florida's education system ranks 29th in the country. Stebbins & Frohlich, supra note 14. This ranking is based in part on the fact that "Florida's public schools receive some of the lowest funding of any state school system in the country." Id. In fact, Florida's per-pupil spending falls well below the national average. Map: Per-Pupil Spending, State-by-State , Educ. Week (June 6, 2018), https://www.edweek.org/ew/collections/quality-counts-2018-state-finance/map-per-pupil-spending-state-by-state.html. Indeed, the national average is $12,256 per student, while Florida spends a mere $9,737 per student.

See, e.g. , Lobato v. State , 304 P.3d 1132, 1137 (Colo. 2013) ("Plaintiffs presented a justiciable claim because 'determin[ing] whether the state's public school financing system is rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" system of public education' does not 'unduly infring[e] on the legislature's policymaking authority.' " (quoting Lobato v. State , 218 P.3d 358, 363 (Colo. 2008) ) ); Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell , 295 Conn. 240, 990 A.2d 206, 210 (2010) ("[T]his court has a role in ensuring that our state's public school students receive th[e] fundamental guarantee" provided in the state constitution.); Rose v. Council for Better Educ. Inc. , 790 S.W.2d 186, 189 (Ky. 1989) ; Cruz-Guzman v. State , 916 N.W.2d 1, 9 (Minn. 2018) ("Although specific determinations of educational policy are matters for the Legislature, it does not follow that the judiciary cannot adjudicate whether the Legislature has satisfied its constitutional duty under the Education Clause."); Columbia Falls Elementary Sch. Dist. No. 6 v. State , 326 Mont. 304, 109 P.3d 257, 261 (2005) ("As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right. We conclude this issue is justiciable."); Leandro v. State , 346 N.C. 336, 488 S.E.2d 249, 253 (1997) ("It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution."); McCleary v. State , 173 Wash.2d 477, 269 P.3d 227, 231 (2012) ("The judiciary has the primary responsibility for interpreting [the constitution] to give it meaning and legal effect."); see also, e.g. , Hoke Cty. Bd. of Educ. v. State , 358 N.C. 605, 599 S.E.2d 365 (2004).

See Ala. Const. art. XIV, § 256 ; Alaska Const. art. VII, § 1 ; Ariz. Const. art. XI, § 1 ; Ark. Const. art. XIV, § 1 ; Cal. Const. art. IX, § 1 ; Colo. Const. title 22, § 1 ; Conn. Const. art. VIII, §§ 1 -2 ; Del. Const. art. X, § 1 ; Ga. Const. art. VIII, § 1; Haw. Const. art. X, § 1 ; Idaho Const. art. IX, § 1 ; Ill. Const. art. X, § 1 ; Ind. Const. art. VIII, § 1 ; Iowa Const. art. IX, § 1 ; Kan. Const. art. VI, § 1 ; Ky. Const. § 138 ; La. Const. art. VIII, § 1 ; Me. Const. art. VIII, § 1 ; Md. Const. art. VIII, § 1 ; Mass. Const. art. V, § 2 ; Mich. Const. art. VIII, § 2 ; Minn. Const. art. VIII, § 1 ; Miss Const. art. VIII, § 201; Mo. Const. art. IX, § 1(a) ; Mont. Const. art. X, § 1 ; Neb. Const. art. VII, § 1 ; Nev. Const. art. XI, § 1 ; N.H. Const. art. 83; N.J. Const. art. XIII, § 1; N.M. Const. art. XII; N.Y. Const. art. XI, § 1 ; N.C. Const. art. I, § 15 ; id. art. IX, §§ 1 -2 ; N.D. Const. art. VIII, §§ 1, 4 ; Ohio Const. art. VI, § 2 ; Okla. Const. art. XIII, § 1 ; Or. Const. art. VIII, §§ 3, 8 ; Pa. Const. art. III, § 14 ; R.I. Const. art. XII, § 1 ; S.C. Const. art. XI, § 3 ; S.D. Const. art. VIII, § 1 ; Tenn. Const. art. XI, § 12 ; Tex. Const. art. VII, § 1 ; Utah Const. art. X, § 1 ; Vt. Const. § 68; Va. Const. art. VIII, § 1 ; Wash. Const. art. IX, § 1 ; W. Va. Const. art. XII, § 1 ; Wis. Const. art. X, § 3 ; Wy. Const. art. I, § 23.

Ironically the plurality relies on a statement by the Foundation for Excellence in Education, an entity dedicated to charter schools and the promotion of "privatization of schools." The website of the Foundation for Excellence in Education, a foundation based in Tallahassee and founded by former Governor Jeb Bush, explains that it strongly supports charter schools and school choice. See About Us , ExcelinEd, https://www.excelined.org/about/approach/ (last visited Dec. 17, 2018). Its mission is to promote "privatization" of schools. Foundation for Excellence in Education , Conservative Transparency, http://conservativetransparency.org/org/foundation-for-excellence-in-education/ (last visited Dec. 17, 2018). Explaining the mission of the amici is not an "ad hominem approach to challenging [the] logic," nor is it an "attempt[ ] to drag politics into judicial decision making." Plurality op. at 142, note 9. It is simply a fact that the plurality embraces the faulty reasoning of the amici.

The State's expert has consistently testified in over twenty of these education cases nationwide on behalf of state governments since the 1970s that there is generally no correlation between spending more money and higher student performance.

See, e.g. , Leandro , 488 S.E.2d at 259 ("Another factor which may properly be considered in this determination is the level of performance of the children of the state and its various districts on standard achievement tests.").

See, e.g. , Idaho Schs. for Equal Educ. Opportunity v. State , 132 Idaho 559, 976 P.2d 913, 922 (1998) ("We do not express any opinion at this time about the appropriate relief that should be granted if the trial court decides that Plaintiffs are entitled to relief."); Leandro , 488 S.E.2d at 261 (stating that if, on remand, the trial court finds a violation "it will then be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment on the other branches of government").