IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-454
No. COA20-485

Filed 7 September 2021

Stokes County, No. 18 CVS 824

LAUREN OSBORNE, by and through her GUARDIAN, MICHELLE ANN
POWELL and MICHELLE ANN POWELL, Plaintiffs,

v.

YADKIN VALLEY ECONOMIC DEVELOPMENT DISTRICT, INCORPORATED;
STOKES COUNTY BOARD OF EDUCATION; STOKES COUNTY SCHOOLS;
SONYA M. COX; PATRICIA M. MESSICK; REBECCA BOLES; WILLIAM HART;
JAMIE YONTZ; BRAD LANKFORD; RONNIE MENDENHALL; JEFF
COCKERHAM; Defendants.

Appeal by Plaintiffs from orders entered 26 August 2019 by Judge Stanley L.

Allen and 18 February 2020 by Judge Eric C. Morgan in Stokes County Superior

Court.  Heard in the Court of Appeals 26 January 2021.

> *Hendrick Bryant Nerhood Sanders & Otis, LLP, by W. Kirk Sanders and
> Joshua P. Dearman, for Plaintiffs-Appellants.*

> *Tharrington Smith, LLP, by Deborah R. Stagner, for Stokes County Board of
> Education, Defendant-Appellee.*

WOOD, Judge.

¶ 1        Lauren Osborne ("Lauren") and Michelle Ann Powell ("Ms. Powell"), Lauren's

mother, (collectively, "Plaintiffs") appeal from an order granting summary judgment

regarding Plaintiffs' negligence claim and Title IX of the Education Amendments of

1972 ("Title IX") claim in favor of the Stokes County Board of Education (the "Board"),

and an order dismissing Plaintiffs' claims under 42 U.S.C. § 1983 *et seq.* ("Section 1983"). After careful review of the record and applicable law, we affirm the order of the trial court.

## I.     Background

Lauren was a twenty-year-old special-needs student who attended West Stokes High School. Lauren is severely disabled with an IQ of forty-one and the functional capacity of a first-grade student. Testimony from Lauren's teacher, nurse, assistant, principal, yellow bus driver, and the superintendent demonstrates Lauren was vulnerable, immature, and susceptible to exploitation. In addition to her mental disability, Lauren suffers from severe diabetes. Her condition requires her to have an insulin pump, emergency medical plan, and monitoring by adults throughout the day as she has needed transportation to the hospital for medical care on several occasions. Lauren also required constant adult supervision at school to prevent bullying by other students.

Every special-needs student has their own Individualized Education Plan ("IEP") prepared by an IEP team that outlines that student's learning plan. Jane Wettach, *Parents' Guide to Special Education in North Carolina* 12 (2017). https://law.duke.edu/childedlaw/docs/Parents%27_guide.pdf. The Board oversees and administers public schools in Stokes County, North Carolina. Entities, like the Board, are required to give parents advance notice of a student's annual IEP

development meeting.  The Board is also required to encourage parents to participate in the development of their student's learning plans.  Throughout her enrollment in Stokes County Schools ("SCS"), Lauren had an IEP, and she received transportation to her assigned school as a "related service" to her IEP, under the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Prior to November 2013, Lauren rode to West Stokes High School on a yellow school bus owned by SCS.  Lauren's bus exclusively transported special-needs students and had an assigned bus monitor[1] because other students on the bus required a monitor as part of their IEPs.  This bus was known as an exceptional children's ("EC") bus.

¶ 4    In 2013, many special-needs students in Stokes County were assigned to specialized classes offered at schools other than their districted schools, and their bus rides could be exceptionally long.  To address the long bus rides for students and to promote the efficiency of its bus fleet, SCS Transportation Director Brad Lankford ("Mr. Lankford") recommended that the Board explore using contracted transportation for exceptional students.  Mr. Lankford investigated the cost of contracting transportation services.  In August 2013, the Board contracted with Yadkin Valley Economic Development District, Inc. ("YVEDDI") to provide

---

[1] A bus monitor rides a school bus on assigned route(s) and schedule(s) to provide safe and efficient transportation so that a student may enjoy the fullest possible advantage from the programs and offerings of the school system. We use "bus monitor" and "safety monitor" interchangeably throughout.

transportation for some of the special-needs students enrolled in SCS.

¶ 5        YVEDDI is a non-profit corporation that has provided transportation services for several neighboring school districts for decades. YVEDDI also provides transportation services for Head Start[2] and sheltered workshop programs for adults with disabilities. Before recommending that YVEDDI provide transportation services for SCS students, Mr. Lankford talked to transportation directors in surrounding counties to get references and an idea of the cost and type of services YVEDDI provided. Mr. Lankford also requested qualification and safety information from YVEDDI's transportation director, Jeff Cockerham ("Mr. Cockerham"). YVEDDI had a safety plan in place which included driver hiring procedures and qualifications, drug testing, vehicle maintenance, and security. Before the Board entered into its initial contract with YVEDDI, Mr. Cockerham provided to Mr. Lankford the following: YVEDDI's safety plan; minimum qualifications for YVEDDI drivers; training program for YVEDDI drivers; YVEDDI's drug and alcohol compliance documentation; preventative maintenance schedule; and certificate of liability insurance. YVEDDI offered to quote its bid with safety monitors on board the vehicles, but the Board declined to have YVEDDI include safety monitors in the

---

[2] Head Start is a federally funded, comprehensive program designed to promote the readiness of infants, toddlers, and preschool-aged children from low-income families through a variety of special services.

bid. The State does not reimburse school systems for safety monitors.

¶ 6    The Board's contract with YVEDDI required the transportation company to comply with its approved safety plan, provide a well-trained driver, conduct pre-employment criminal background checks and drug testing of drivers, and to conduct random drug testing according to North Carolina Department of Transportation ("NCDOT") regulations. YVEDDI began transporting some SCS special-needs students to and from school in August 2013, at the start of the 2013-2014 school year. The Board entered into subsequent contracts with YVEDDI to transport special-needs students to and from school in the 2014-2015 and 2015-2016 school years. The YVEDDI vans that transported SCS students were equipped with safety equipment including first aid kits, NCDOT-mandated video cameras, and "push to talk phones."

¶ 7    Lauren was accustomed to riding a yellow school bus with other special-needs students and a safety monitor for transportation to West Stokes High School. Starting in November 2013, the Board changed Lauren's transportation from an exceptional students school bus with a safety monitor to a YVEDDI van that did not have a safety monitor. The school notified Lauren's mother of the change to Lauren's transportation service only after the arrangements were made. According to Mr. Lankford's deposition testimony, Lauren's change from an exceptional students school bus with a safety monitor to a YVEDDI van without one required an IEP team meeting. Additionally, Lauren's teacher testified that transportation was not

discussed in Lauren's annual IEP meeting, and furthermore, had it been discussed during the meeting, he would have recommended a safety monitor for his special-needs students like Lauren.

¶ 8        During the 2014-2015 and 2015-2016 school years, Lauren was transported in a YVEDDI van driven by Robert King ("King"), a YVEDDI employee. King held a valid North Carolina driver's license that met YVEDDI's license requirements. King completed YVEDDI's application, screening, and driver training required under YVEDDI's safety plan. King had no prior criminal record and received both pre-employment and quarterly criminal background checks. King was drug tested and received forty hours of classroom and on-the-job driver training that met NCDOT standards. King was trained on interacting with disabled passengers; sensitivity and sexual harassment; defensive driving; bloodborne pathogens; and first aid and CPR. King was also informed he was not supposed to touch the students he was transporting.

¶ 9        On two separate days in December 2015, while transporting Lauren and other students, King stopped the YVEDDI van multiple times and sexually assaulted Lauren. The YVEDDI van was equipped with video cameras, and video evidence reveals King sexually assaulted Lauren twenty-one times by groping and digitally penetrating her. Though Lauren was twenty years old, she only had the functional capacity of a first-grade student and lacked the capability to comprehend and consent

to the sexual acts committed against her. Specifically, Lauren lacked the communication skills to tell Ms. Powell why she suffered from anal bleeding resulting from the sexual assaults.

¶ 10        A Stokes County resident was concerned about the operation of the van and reported King's driving to YVEDDI, which prompted the company to review the video footage on Lauren's van. YVEDDI discovered King's inappropriate actions against Lauren and immediately reported King's actions to law enforcement and terminated his contract. YVEDDI did not notify the Board of the assaults, King's arrest, or King's termination. School officials first learned about the sexual assaults from Lauren's mother, Ms. Powell, after she was contacted by law enforcement following King's arrest. When the Board's superintendent, assistant superintendent, Exceptional Childrens director, transportation director, and the West Stokes High School principal all learned of the sexual assaults, they did not investigate for other potential sexual assaults against students, draft a report on Lauren's sexual abuse, or offer post-abuse counseling. The Board's policies require all verified sexual assault cases to be investigated and reported to the State Board of Education. The Board also requires written documentation of all reports of sexual assaults and requires the school system's responses to be maintained. The Board did not report Lauren's sexual assaults to the State Board of Education as required by its standard procedure, nor did it offer an explanation as to why it did not follow its standard procedure.

¶ 11        On December 4, 2018, Plaintiffs filed a complaint against the Board, the Board's individual school board members and staff, YVEDDI, Mr. Cockerham, and SCS. Plaintiffs asserted claims for negligence; negligence *per se*; negligent infliction of emotional distress; Section 1983 discrimination; Title IX damages; and negligent supervision, retention, and common carrier stemming from the multiple sexual assaults by the van driver.

¶ 12        On March 6, 2019, the Board filed its answer and motion to dismiss Plaintiffs' Section 1983 and Title IX claims. On August 26, 2019, the trial court granted the Board's motion in part, dismissing all of Plaintiffs' Section 1983 claims and Plaintiffs' Title IX claims with respect to the individual school board members and staff. The Title IX claims against the Board, however, remained intact. On August 22, 2019, Plaintiffs voluntarily dismissed their claims against YVEDDI and Mr. Cockerham.

¶ 13        On November 13, 2019, Plaintiffs moved for partial summary judgment on liability and causation of damages regarding Plaintiffs' negligence *per se* claim. The Board moved for summary judgment as to Plaintiffs' remaining Title IX; negligence; negligence *per se*; and negligent supervision, retention and common carrier claims on November 14, 2019. On February 18, 2020, the trial court denied Plaintiffs' motion for partial summary judgment and granted the Board's motion for summary judgment on Plaintiffs' negligence *per se*; negligence; negligent infliction of emotional distress; Title IX; and negligent hiring, training, retention, and supervision claims.

On March 2, 2020, Plaintiffs filed a notice of appeal.

## II.  Discussion

¶ 14    Plaintiffs raise several arguments on appeal.  Each will be addressed in turn.

### A. The Board's Motion to Dismiss

¶ 15    Plaintiffs contend the trial court erred in granting the Board's motion to dismiss Plaintiffs' claims under Section 1983.  Plaintiffs' claims arise from alleged violations of Lauren's constitutional rights to equal protection and substantive due process.  Plaintiffs asserted an additional Section 1983 claim alleging failure to train and supervise.  Specifically, Plaintiffs argue the trial court erred in dismissing their Section 1983 claims because their complaint "stated sufficient factual allegations" to state a claim pursuant to N.C. R. Civ. P. 12(b)(6).  We disagree.

¶ 16    In reviewing an order granting a motion to dismiss, "we review the pleadings *de novo* to determine their legal sufficiency and . . . whether the trial court's ruling was proper." *Radcliffe v. Avenel Homeowners Ass'n, Inc.*, 248 N.C. App. 541, 552, 789 S.E.2d 893, 902 (2016) (citation omitted).  "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 205, 367 S.E.2d 609, 612 (1988).  "North Carolina is a notice pleading state." *White v. Trew*, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013) (citation omitted).  "While the concept of notice pleading is liberal in nature, a complaint must nonetheless state enough to give the substantive elements of a legally recognized

claim or it may be dismissed under Rule 12(b)(6)." *Raritan River Steel Co.*, 322 N.C. at 205, 367 S.E.2d at 612.

"When the complaint on its face reveals the absence of fact sufficient to make a good claim, dismissal of the claim pursuant to Rule 12(b)(6) is properly granted." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001) (internal quotations marks, citation, and alterations omitted). "On a motion to dismiss, the complaint's material factual allegations are taken as true. Legal conclusions, however, are not entitled to a presumption of validity." *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 195, 767 S.E.2d 374, 377 (2014) (citation omitted). Dismissal is appropriate when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Wood v. Guilford Cnty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citation omitted).

### 1. *Equal Protection*

Plaintiffs allege the Board violated Lauren's constitutional right to equal protection. The Equal Protection Clause of the Fourteenth Amendment (the "Equal Protection Clause") to the United States Constitution (the "Constitution") provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection

claim, a plaintiff must plead sufficient facts to "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003) (citation and quotation marks omitted), *cert. denied*, 540 U.S. 1089, 124 S. Ct. 958, 157 L. Ed. 2d 794 (2003); *see also Gilreath v. Cumberland Cnty. Bd. of Educ.*, No. COA16-927, 2017 N.C. App. LEXIS 307, at *16-17 (N.C. Ct. App. April 18, 2017). The second element of an equal protection claim requires factual allegations sufficient to show that any unequal treatment was done intentionally or purposefully to discriminate against the plaintiff. *Good Hope Hosp., Inc. v. N.C. Dept. of Health and Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005)).

Here, the complaint alleges that "Lauren, as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." However, because the complaint is devoid of any factual allegations sufficient to establish that Lauren was treated differently from similarly situated male students, it fails to state the first element of an equal protection violation based on Lauren's gender. *See Hanton v. Gilbert*, 842 F. Supp. 845, 854 (M.D.N.C.), *aff'd*, 36 F.3d 4 (4th Cir. 1994) ("Plaintiff must show that she was treated differently from other similarly situated individuals and that but for her sex she would not have been so treated."); *see also Gilreath*, 2017 N.C. App. LEXIS

307, at \*16-17.

Plaintiffs also allege in the complaint that Lauren was denied equal protection on the basis of her disability, because she was isolated and segregated from the general student population in transportation. However, the Supreme Court has held that the disabled are not a suspect or quasi-suspect class entitled to special protection under the Equal Protection Clause. *See Brown v. N.C. Dep't of Motor Vehicles*, 166 F.3d 698, 706 (4th Cir. 1999); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445-46, 105 S. Ct. 3249, 3257-58, 87 L. Ed. 2d 313, 324 (1985).

Therefore, we conclude Plaintiffs' claim under Section 1983 for violation of the Equal Protection Clause was properly dismissed under Rule 12(b)(6).

### 2. *Substantive Due Process*

Plaintiffs also allege the Board deprived Lauren of her right to substantive due process. "Section 1983 imposes liability on state actors who cause the deprivation of any rights, privileges, or immunities secured by the Constitution. Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Doe v. Durham Pub. Sch. Bd. of Educ.*, No. 1:17-CV-773, 2019 WL 331143, at \*8 (M.D.N.C. Jan. 25, 2019); *see also Farrell v. Transylvania Cnty. Bd. of Educ.*, 199 N.C. App. 173, 180, 682 S.E.2d 224, 230 (2009) (recognizing the "right to ultimate bodily security . . . is unmistakably established in our constitutional decisions as an

attribute of the ordered liberty that is the concern of substantive due process" (citation omitted)). Sexual molestation of a student by a state actor may be a constitutional injury for purposes of Section 1983. *Durham Pub. Sch. Bd. of Educ.*, 2019 WL 331143 at * 8 (citations omitted). However, "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ.*, 3 Fed. App'x 25, 32 (4th Cir. 2001) (citing *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 198, 109 S. Ct. 998, 1004, 103 L. Ed. 2d 249, 260 (1989)).

¶ 23 Here, Plaintiffs allege the Board "created a dangerous environment for Lauren" by contracting with YVEDDI to transport disabled students, failing to require YVEDDI to have a monitor on the bus, and by not verifying that YVEDDI was monitoring the video camera. However, "to establish [Section] 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through *affirmative acts*, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015) (emphasis added); *see also DeShaney*, 489 U.S. at 201, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262-63 (observing that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them . . . . Under th[o]se circumstances, the State had no constitutional duty to protect [the child.]"). Plaintiffs'

complaint does not contain factual allegations that would establish conduct by the Board that was so intentional or affirmative that it shocks the conscience.

Thus, we conclude Plaintiffs' claim under Section 1983 for violation of substantive due process was properly dismissed under Rule 12(b)(6).

### 3. *Failure to Train and Supervise*

Plaintiffs also allege the Board failed to properly train and supervise its employees, including YVEDDI and King, which led to violations of Lauren's constitutional rights to equal protection. As a preliminary matter, we note our courts have not yet decided a failure to train claim arising under Section 1983. Therefore, we look to decisions of federal jurisdictions for persuasive guidance.

> A municipality's failure to train its officials can result in liability under [S]ection 1983 only when such failure reflects a deliberate indifference to the rights of its citizens and the identified deficiency in a city's training program [is] closely related to the ultimate injury. Additionally, a plaintiff must show a direct causal link between a specific deficiency in training and the particular violation alleged.

*Hill v. Robeson Cnty., N.C.*, 733 F. Supp. 2d 676, 686-87 (E.D.N.C. 2010) (internal citations and quotation marks omitted). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417, 426-27 (2011). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . .

A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 61-62 (internal quotation marks omitted). The deficiency in training must also "make the occurrence of the specific violation a 'reasonable probability rather than a mere possibility.'" *Hatley v. Bowden*, No. 5:13-CV-765-FL, 2014 WL 860538, at *3-4 (E.D.N.C. Mar. 5, 2014) (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 713 (4th Cir. 1999)).

¶ 26        Here, Plaintiffs fail to allege sufficient factual allegations to support a liability claim under Section 1983 for failure to train the Board, school officials, YVEDDI, and King. Plaintiffs do not allege there were prior incidents of this kind, nor are there any factual allegations showing that the Board or school officials demonstrated a deliberate indifference that was likely to lead to a contracted bus driver's sexual abuse of a student. The failure to train municipal personnel may rise to the level of an unconstitutional custom or policy, where there is a history of widespread abuse. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412, 426-27 (1989); *see also Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983). Plaintiffs further fail to identify any specific deficiency in training that led to a violation of Lauren's constitutional rights. Instead, the complaint contains general contentions that the Board failed to provide training or supervision regarding the duty to "[m]onitor, perceive, and stop sexual assault and abuse." However,

allegations of mere negligence with regard to training are insufficient to state a claim for municipal liability. *See Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)); *see also City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1205, 103 L. Ed. 2d at 427 (finding that mere allegations regarding a city policy or custom cannot confer municipal liability for failure to train (citations omitted)).

¶ 27        Plaintiffs also asserted Section 1983 liability based on a failure to supervise.

> [T]o establish supervisory liability under [Section] 1983[, a plaintiff must show]: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See Farrell*, 199 N.C. App. at 181, 682 S.E.2d at 230 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S. Ct. 67, 130 L. Ed. 2d 24 (1994)). Likewise, "a supervisor's failure to train his employees can subject him to liability where the failure to train reflects a 'deliberate indifference' to the rights of citizens." *Durham Cnty. Bd. of Educ.*, 2019 WL 331143, at *8 (quoting *Layman v. Alexander*, 294 F. Supp. 2d 784, 793 (W.D.N.C. 2003)); *see also City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1204, 103 L. Ed. 2d at 429 (holding that respondent's civil rights claim was cognizable only if petitioner's failure to train its police force "reflect[ed] a

deliberate indifference to the constitutional rights of its inhabitants").

¶ 28 Here, King is the only individual Plaintiffs allege to have abused Lauren. King was not a subordinate of the Board. No school employee is alleged to have committed acts upon Lauren that violated her substantive due process rights to bodily integrity and to be free from sexual abuse. Thus, a claim that the Board failed to properly train or supervise its employees or subordinates fails.

¶ 29 Plaintiffs do not allege facts of supervisory liability sufficient to survive a motion to dismiss. All factual allegations in the complaint regarding the Board's alleged supervisory liability consist of contentions that it failed to ensure YVEDDI properly trained and supervised its employees. Such allegations simply do not support a plausible conclusion that the Board had actual or constructive knowledge that King was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Lauren. Therefore, the trial court properly dismissed Plaintiffs' Section 1983 claims against the Board for failure to train and supervise.

## B. The Board's Motion for Summary Judgment

¶ 30 Next, Plaintiffs allege the trial court erred in granting Defendant's motion for summary judgment with respect to Plaintiffs' negligence and Title IX claims.

¶ 31 This Court reviews an appeal from a summary judgment order *de novo*. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007). "Under a *de novo* standard of review, this Court considers the matter anew and freely substitutes its own judgment

for that of the trial court." *Reese v. Mecklenburg Cnty.*, 200 N.C. App. 491, 497, 685 S.E.2d 34, 38 (2009) (citations omitted).

¶ 32 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. 1A-1, Rule 56(c) (2020). "If a genuine issue of material fact exists, a motion for summary judgment should be denied." *Park East Sales, LLC v. Clark-Langley, Inc.*, 186 N.C. App. 198, 202, 651 S.E.2d 235, 238 (2007) (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 471, 597 S.E.2d 674, 694 (2004)).

¶ 33 To survive a motion for summary judgment in a negligence case, the plaintiff must establish a *prima facie* case of negligence. Specifically, Plaintiffs must show "(1) [the Board] owed the plaintiff a duty of reasonable care, (2) [the Board] breached that duty, (3) [the Board's] breach was an actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages as the result of [the Board's] breach." *Gibson v. Ussery*, 196 N.C. App. 140, 143, 675 S.E.2d 666, 668 (2009) (quoting *Winters v. Lee*, 115 N.C. App. 692, 694, 446 S.E.2d 123, 124 (1994) (citations omitted)). "[T]he question of foreseeability is one for the jury." *Carsonaro v. Colvin*, 215 N.C. App. 455, 459, 716 S.E.2d 40, 45 (2011) (quoting *Fussell v. NC Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010)). Summary judgment is rarely granted in

negligence cases. *King v. Allred*, 309 N.C. 113, 115, 305 S.E.2d 554, 556 (1983).

¶ 34        "The party moving for summary judgment has the burden of establishing the lack of any triable issue," and "[a]ll inferences of fact from the proofs offered at the hearing must be drawn . . . in favor of the party opposing the motion." *Monzingo v. Pitt County Memorial Hosp. Inc.*, 331 N.C. 182, 187, 415 S.E.2d 341, 344 (1992) (citations omitted). The Board has the burden to prove Plaintiffs failed to demonstrate the essential elements of negligence. *See id.* (citations omitted).

## 1. *The Board's Negligence*

¶ 35        Plaintiffs contend the trial court erred in granting the Board's motion for summary judgment with respect to Plaintiffs' negligence claim. Plaintiffs argue genuine issues of material fact exist regarding (1) the duty of care the Board owed to Lauren and (2) the foreseeability of the harm Lauren suffered. While we sympathize with Plaintiffs for the irreparable harm Lauren suffered, we must find the trial court properly granted summary judgment under our current tort law.

¶ 36        First, the parties dispute whether the Board should be held to a heightened standard of care when making transportation decisions for special-needs students. Plaintiffs contend the Board had a heightened duty of care to ensure Lauren's safety from the dangerous actions of others because she was a member of a vulnerable population. In cases where the student in question is a member of a vulnerable population, particularly one who possesses an IQ far below the average for her age,

we reiterate that the State owes a duty of care "relative to the [victim]'s maturity." *Nowlin v. Moravian Church in Am.*, 228 N.C. App. 307, 311, 745 S.E.2d 51, 54 (2013). In *Nowlin*, this Court held "foreseeability of harm to the [victim] is the relevant test which defines the extent of the duty to safeguard [victims] from the dangerous acts of others." *Nowlin*, 228 N.C. App. at 311, 745 S.E.2d at 54. Under a pure "foreseeability of harm test," we recognize a jury could reasonably conclude the Board owed students such as Lauren a heightened duty of care. *See id.*; *see also Carsonaro*, 215 N.C. App. at 459, 716 S.E.2d at 45 (citing *Fussell*, 364 N.C. at 226, 695 S.E.2d at 440) (holding foreseeability is generally a question to be decided by the jury). While we agree with Plaintiffs that the Board was required to exercise a heightened duty of care while making decisions regarding its special needs pupils, we find the trial court properly granted summary judgment under our current tort law.

¶ 37        Plaintiffs rely on *Slade v. New Hanover Cnty. Bd. of Educ.*, 10 N.C. App. 287, 291, 178 S.E.2d 316, 318 (1971), in which this Court recognized that certain school employees, such as a bus driver, have a duty to exercise a high degree of caution in fulfilling their employment obligations. 10 N.C. App. at 291, 178 S.E.2d at 318 (citing *Greene v. Board of Education*, 237 N.C. 336, 340, 75 S.E.2d 129, 131 (1953)). This Court noted that a bus driver is responsible for the safety of children of different ages and levels of maturity so that "it is his duty to see that those who do alight [from the bus] are in places of safety" and looked after with care "proportionate to the degree of

danger inherent in the passenger's youth and inexperience." *Id.* at 291, 295, 178 S.E.2d at 318, 321. We emphasize the standard recognized in *Slade* and reiterate that certain school employees have a duty to exercise a high degree of caution in fulfilling their responsibilities. However, a fundamental principle of our current tort law defeats Plaintiffs' claim in this case. Generally, "one who employs an independent contractor is not liable for the independent contractor's negligence unless the employer retains the right to control the manner in which the contractor performs his work." *Woodson v. Rowland*, 329 N.C. 330, 350, 407 S.E.2d 222, 234 (1991). The only exception to this rule is certain non-delegable duties, such as work involving ultrahazardous or inherently dangerous activity. *Id.*

¶ 38    Here, the Board delegated its duty to safely transport Stokes County students pursuant to N.C. Gen. Stat. § 115C-253, which provides "[a]ny local board of education may . . . enter into a contract with any person, firm or corporation for the transportation . . . of pupils enrolled in the public schools." N.C. Gen. Stat. § 115C-253 (2020). Plaintiffs essentially argue the Board should be held liable in tort law despite the Board's statutory authority to delegate the transportation of its students. However, this theory of liability ignores our current independent contractor rules. There is no evidence in the record to suggest the Board retained the right to control the manner in which YVEDDI would transport students such as Lauren. YVEDDI hired and controlled the drivers, owned its own vehicles, determined its routes, and

set its own policies. The Board researched and reviewed YVEDDI's reputation, safety plans, and, after contracting, provided names and addresses of students to be transported, along with bell times. Therefore, the Board did not exercise the degree of control over YVEDDI necessary to convert YVEDDI from an independent contractor to an employee.

¶ 39      Nor is there any evidence to suggest that transporting students is an ultrahazardous or inherently dangerous activity. Moreover, the statute authorizing school districts to contract for student transportation expressly indicates that this is a delegable duty. *See* N.C. Gen. Stat. § 115C-253. As this Court has previously recognized, "the administration of the public schools of the state is best left to the legislative and executive branches of government." *Leandro v. State*, 346 N.C. 336, 357, 488 S.E.2d 249, 261 (1997). "[T]he courts of the state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education." *Id.* Therefore, while we agree that the Board should exercise the utmost standard of care while making decisions regarding its students, we are obliged to find the Board could properly delegate any duty owed to Lauren to an independent contractor such as YVEDDI under our current law. *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue,

albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." (citations omitted)).

¶ 40        Although no North Carolina court has considered whether the duty to transport students safely is delegable on these facts, other jurisdictions have expressly declined to extend tort liability in circumstances where the harm occurred when the student was not in the school's physical custody.  In *Chainani v. Bd. of Educ. of City of New York*, 663 N.E.2d 283, 286 (N.Y. 1995), New York's high court rejected the argument that safe transportation of students was non-delegable and held that "the schools had contracted-out responsibility for transportation, and therefore cannot be held liable on a theory that the children were in their physical custody at the time of injury."  The court noted that the legislature authorized schools to contract with third parties for student transportation; thus, the school districts were "relying reasonably on the company to act responsibly in protecting the safety of the children it was charged to transport." *Id.*  Similarly, in *Dixon v. Whitfield*, 654 So. 2d 1230, 1232 (Fla. Dist. Ct. App. 1995), the court observed that, given the statutes and regulations authorizing contractors to transport public school students, "the parties cite no controlling Florida authority, and we could find none in our own research, for the proposition that the safe transportation of public school students is a nondelegable duty." *Id.*  The same is true in North Carolina.  Absent guidance from our Supreme Court or our legislature, we must hold the Board is not an "insurer of

student safety," *see Payne v. N. Carolina Dep't of Human Res.*, 95 N.C. App. 309, 313, 382 S.E.2d 449, 451 (1989), but delegated any duty it owed to Lauren pursuant to the statutory authority found in N.C. Gen. Stat. § 115C-253. In our discretion, we address the foreseeability of Lauren's injury.

¶ 41        While we are bound by our precedent and affirm the order of the trial court, we recognize there is no genuine dispute as to the foreseeability of Lauren's injury. Here, Lauren was a twenty-year-old special-needs student with an IQ of forty-one and severe diabetes. Testimony from Lauren's teacher, nurse, assistant, principal, yellow bus driver, and the superintendent demonstrates Lauren was vulnerable, immature, and susceptible to exploitation. Lauren had the functional capacity of a first-grade student and lacked the capability to comprehend and consent to the sexual acts committed against her. In addition to her mental disabilities, Lauren's diabetes and related medical care required constant adult supervision during the school day. On several occasions, while enrolled in SCS, Lauren had to go to the hospital directly from her school for medical care. It is undisputed that Lauren's intellectual disabilities and medical fragility render her highly susceptible to exploitation and harm without proper monitoring and support.

¶ 42        The Special Education environment is full of specialized customs and practices designed to provide the particular care, supervision, and protections needed to enable each individual student access to an appropriate education. Where there is an

existing custom or practice in place utilized to protect a special-needs student, it stands to reason a harm could be more likely in the absence of such a custom. *See Briggs v. Morgan*, 70 N.C. App. 57, 61, 318 S.E.2d 878, 881-82 (1984) (A customary practice "is normally relevant and admissible as an indication of what the community regards as proper" to address the risks of a particular individual. (citation omitted)). Because the Board's customary practice had been to provide transportation for Lauren on an exceptional students school bus staffed with a safety monitor, we emphasize that Lauren's injury was one that could have been prevented.

¶ 43        Absent guidance by our legislature, we are obliged to hold the trial court did not err in granting summary judgment. To hold otherwise would be to ignore the independent contractor rule, that states when an employer properly delegates a duty pursuant to a statutory authority, its duty ceases. Because we are bound by our precedent, we hold the trial court did not err in granting summary judgment.

### 2. *Title IX.*

¶ 44        Plaintiffs further contend that the trial court erred in granting the Board's motion for summary judgment on the Board's alleged violation of Title IX. We disagree.

¶ 45        As discussed *supra*, this Court reviews an appeal from a summary judgment order *de novo*. *Forbis*, 361 N.C. at 524, 649 S.E.2d at 385. Pursuant to Rule 56 of our rules of civil procedure, summary judgment is appropriate where there is no genuine

dispute of material fact. N.C. Gen. Stat. § 1A-1, Rule 56. Generally, the moving party "has the burden of demonstrating a lack of triable issues." *Monzingo*, 331 N.C. at 187, 415 S.E.2d at 344. In reviewing a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. *Id.*

¶ 46 Title IX prohibits sex-based discrimination in education programs or activities receiving federal financial assistance. *See* 20 U.S.C. § 1681 *et seq.* Sexual harassment and abuse of a student can constitute discrimination "on the basis of sex" under Title IX. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75, 112 S. Ct. 1028, 1037, 117 L. Ed. 2d 208, 223 (1992). However, an institution such as the Board can be held liable for a Title IX violation if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution]'s programs and fails adequately to respond. . . . [It] amount[s] to deliberate indifference to discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L. Ed. 2d 277, 292 (1998).

¶ 47 The 11th Circuit Court of Appeals ("11th Circuit") found that "[t]o survive a summary judgment motion, a Title IX plaintiff must present evidence from which a reasonable jury could conclude the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015) (internal quotation marks omitted). "The

deliberate indifference standard is rigorous and hard to meet." *Id.* at 975. We find the 11th Circuit's reasoning compelling and apply its rationale in this instance.

¶ 48    In this case, Plaintiffs' Title IX claim fails because no school employee or Board member had actual knowledge of King's sexual abuse of Lauren until after he had been arrested and terminated. The undisputed evidence shows school officials learned that King had abused Lauren only after the sheriff notified Ms. Powell, who in turn, contacted the school principal. In the absence of any evidence that a school official or Board member with authority to remedy alleged discrimination had actual knowledge of King's abuse of Lauren, there is no genuine issue of material fact as to Plaintiffs' Title IX claim against the Board. Therefore, we affirm the trial court's grant of summary judgment in favor of the Board with respect to Plaintiffs' Title IX claim.

## III.    Conclusion

¶ 49    We hold the trial court properly dismissed Plaintiffs' claims under Section 1983 and granted summary judgment with respect to Plaintiffs' Title IX claim. Under our current tort law, and, absent any guidance from our Supreme Court and legislature, we find the trial court did not err in granting summary judgment in favor of the Board on the issue of negligence pursuant to the independent contractor rule. Accordingly, we affirm the order of the trial court.

AFFIRMED.

Judge DIETZ concurs by separate opinion.

Judge ARROWOOD concurs by separate opinion.

No. COA20-485 – *Osborne v. Yadkin Valley Econ. Dev. Dist. Inc.*

DIETZ, Judge, concurring by separate opinion.

I concur in the majority's judgment. I write separately to address two issues. First, I do not agree with the statements in the majority opinion and my concurring colleague's opinion that "there is no genuine dispute as to the foreseeability of Lauren's injury" and that "the injury in this case was certainly foreseeable."

I am not prepared to hold that the felony sexual assault of a vulnerable special-needs student is always foreseeable to school officials as a matter of law. Criminal acts ordinarily are not foreseeable under tort law principles. *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 638, 281 S.E.2d 36, 38 (1981). Had this claim reached a jury, the foreseeability of Lauren's injury and issues of superseding and intervening causation would have been core disputed facts to be resolved by the jury. *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 237–38, 311 S.E.2d 559, 567 (1984).

Second, I do not agree with my concurring colleague that there are "inconsistencies . . . in the protections that are afforded to our most vulnerable children depending on whether the school system provides the transportation or contracts with a third party." The duty of care owed to Lauren and every other school student is the same whether their transportation is provided by the school itself or

by a contractor who has taken on that duty. Whatever heightened level of protection

the school district owed Lauren because of her special needs, the duty to provide that

same level of protection passed to YVEDDI under the independent contractor rule.

No. COA20-485 – *Osborne v. Yadkin Valley Economic Dev. Dist. Inc.*

ARROWOOD, Judge, concurring by separate opinion.

¶ 53        I concur in the majority opinion as being necessitated by law but write separately to express my concerns with the interaction between the statutory scheme and our caselaw.  The statute authorizing delegation of the duty to transport public school students has effectively permitted boards of education to contract out of the heightened standard of care that this Court has previously held them to.

¶ 54        With respect to safeguarding public school students, this Court has held that the party charged with safeguarding our youth owes a duty of care "relative to the [victim]'s maturity[,]" specifically defining the extent of the duty required by the "foreseeability of harm to the [victim.]" *Nowlin v. Moravian Church in Am.*, 228 N.C. App. 307, 311 745 S.E.2d 51, 54 (2013) (holding that camp employees have a duty to exercise the same standard of care that a person of ordinary prudence, charged with the duty of supervising campers, would exercise under the same circumstances). Similarly, this Court held "[t]he care which a school bus driver must exercise toward a school bus passenger is proportionate to the degree of danger inherent in the passenger's youth and inexperience." *Slade v. New Hanover Cty. Bd. of Ed.*, 10 N.C. App. 287, 295, 178 S.E.2d 316, 321 (1971).  Both standards reinforce the higher

standard of care owed by the governmental authority to public school students under supervision, especially in situations where a student is more vulnerable.

¶ 55          Although this standard would apply here had the van driver been directly employed by the school system, the standard does not apply in the case *sub judice* for two reasons. First is N.C. Gen. Stat. § 115C-253 (2019), which allows any board of education to delegate their duty to transport public school students to "any person, firm or corporation[.]" The second is the well-established principle in our state's tort law that generally, "one who employs an independent contractor is not liable for the independent contractor's negligence unless the employer retains the right to control the manner in which the contractor performs his work." *Woodson v. Rowland*, 329 N.C. 330, 350, 407 S.E.2d 222, 234 (1991) (citation omitted). There is an exception to this rule only for certain non-delegable duties, including ultrahazardous or inherently dangerous activity. *Id.* In this case, because transporting students to school does not qualify as an ultrahazardous or inherently dangerous activity, the exception does not apply.

¶ 56          Taken together, *Woodson* and N.C. Gen. Stat. § 115C-253 effectively eliminate the Board of Education's duty to any public student unfortunate enough to find themselves in a vehicle operated by an independent contractor. Although this Court has held the governmental authority to a higher standard of care for bus drivers employed directly by the school district, the statute relieves them of their duty

without any other apparent safeguards or higher standards with respect to who may be entrusted with the duty of transporting and supervising public school students. Absent further guidance from our General Assembly, it appears the standard of care owed by the governmental authority in these contexts depends entirely on how the driver is employed.

¶ 57      As the majority pointedly notes, the injury in this case was certainly foreseeable. Public school students, particularly vulnerable students like Lauren, are inherently at greater risk of injury and are accordingly owed a higher standard of care in these contexts. This duty is originally the Board of Education's to bear.

¶ 58      Given the interplay between *Woodson* and N.C. Gen. Stat. § 115C-235, I am compelled to concur in the result, but I write to point out the inconsistencies that this result creates in the protections that are afforded to our most vulnerable children depending on whether the school system provides the transportation or contracts with a third party. While I question whether this was the result that was intended when the statute was enacted, I see no avenue for relief from this conundrum absent legislative action or our Supreme Court's revisiting of the *Woodson* doctrine.